ACCEPTED
03-14-00709-CV
4187470
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/18/2015 9:33:00 AM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00709-CV

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/18/2015 9:33:00 AM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC.
**Appellants,**

**v.**

PUBLIC UTILITY COMMISSION OF TEXAS
**Appellee.**

*Appeal from the 53rd Judicial District Court, Travis County, Texas
The Honorable Amy Clark Meachum, Judge Presiding*

## APPELLEE TEXAS INDUSTRIAL ENERGY CONSUMERS' BRIEF

### FEBRUARY 13, 2015

Rex D. VanMiddlesworth
rex.vanmiddlesworth@tklaw.com
State Bar No. 20449400
Benjamin Hallmark
benjamin.hallmark@tklaw.com
State Bar No. 24069865
THOMPSON & KNIGHT LLP
98 San Jacinto Blvd., Suite 1900
Austin, TX 78701
Telephone: (512) 469-6100
Facsimile: (512) 469-6180
ATTORNEYS FOR APPELLEE TEXAS
INDUSTRIAL ENERGY CONSUMERS

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES............................................................................................iv

STATUTORY AUTHORITIES .......................................................................................v

LEGISLATION ............................................................................................................. v

STATEMENT OF THE CASE .....................................................................................vii

STATEMENT ON ORAL ARGUMENT.......................................................................vii

RESTATED ISSUES PRESENTED..............................................................................vii

STATEMENT OF FACTS............................................................................................. 1

    I.      The legislature delayed deregulation in ETI's service area, but took a small step towards competition by authorizing a CGS program...................1

    II.    ETI proposed a CGS tariff in Commission Docket 37744. .........................3

    III.   The parties agreed on a different CGS program in Docket 38951, but could not agree on what costs would be unrecovered as a result of its implementation. ........................................................................................5

    IV.   The Commission found that the only costs that would be unrecovered as a result of implementation of the new CGS program were the costs to implement and administer it. ............................................6

    V.    The Commission rejected ETI's proposal to surcharge pre-implementation CGS regulatory expenses and denied ETI's request for interest on costs of implementing a CGS program...............................10

SUMMARY OF ARGUMENT ..................................................................................... 11

ARGUMENT............................................................................................................... 15

    I.      The Commission's finding on ETI's unrecovered costs is supported by substantial evidence and consistent with the CGS statute. ...................15

         A.     Standard of Review .......................................................................15

B.     The evidence showed that ETI would not incur any costs to serve CGS customers that would be unrecovered, other than implementation and administration costs. ...................................... 16

C.     ETI did not prove that it has unavoidable fixed generation costs that would be unrecovered as a result of the CGS program. .................................................................................... 19

D.     The Commission properly determined that the costs to implement and administer the CGS tariff would be unrecovered and included this finding in its order. .......................... 22

E.     The Commission properly rejected ETI's attempt to recast the statutory term "costs unrecovered" as lost revenues. ....................... 23

       1.     The Commission's interpretation is consistent with the plain language of PURA § 39.452(b). .............................................. 23

       2.     The Commission's decision is consistent with the *CenterPoint 2011* precedent. .................................................. 25

       3.     ETI sought lost revenues at the Commission, not unrecovered costs. ..................................................................... 30

       4.     The Commission's rejection of ETI's lost-revenues theory is consistent with the purposes of the CGS statute. .................. 33

       5.     *High Plains* is inapposite. ...................................................... 34

F.     Contrary to ETI's contentions, the Commission's decision was based on a vast evidentiary record, not "solely upon its interpretation of the CGS statute" ...................................................... 35

II.     The Commission properly rejected ETI's request to surcharge legal and regulatory costs incurred from 2010 to 2013 as costs of implementation. .............................................................................. 38

III.     The Commission properly rejected ETI's request for interest on CGSC rider costs. .............................................................................. 42

A.     When the legislature intends to award carrying costs, it says so. ............................................................................................ 42

B.     The Commission has not allowed interest to be recovered on similar expenses. ................................................................. 44

PRAYER ............................................................................................................. 46

CERTIFICATE OF COMPLIANCE ................................................................. 47

CERTIFICATE OF SERVICE........................................................................... 48

APPENDIX ....................................................................................................... 49

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.*
   354 S.W.3d 899 (Tex. App. – Austin 2011, no pet.) .................................. *passim*

*CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.,*
   408 S.W.3d 910 (Tex. App. – Austin 2013, pet. Denied ....................................41

*CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.*
   143 S.W.3d 81 (Tex. 2004) ..............................................................................46

*City of El Paso v. Pub. Util. Comm'n,*
   883 S.W.2d 179 (Tex. 1994) ............................................................................16

*In re Entergy Corp.,*
   142 S.W.3d 316 (Tex. 2004) ..............................................................................1

*Laidlaw Waste Sys., Inc. v. City of Wilmer*,
   904 S.W.2d 656 (Tex. 1995) ....................................................................... 44, 45

*Moran Util. Co. v. R.R. Comm'n,*
   697 S.W.2d 447, (Tex. App.—Austin 1985, pet. granted) (aff'd in
   relevant part, rev'd in part, 728 S.W.2d 764 (Tex. 1987) ..................................46

*Office of Public Utility Counsel v. Texas-New Mexico Power Co.,*
   344 S.W.3d 446 (Tex. App.—Austin 2011, pet. denied) ...................................38

*R.R. Comm'n v. High Plains Natural Gas Co.,*
   628 S.W.2d 753 (Tex. 1981) ............................................................................34

*R.R. Comm'n v. Texas Citizens for a Safe Future & Clean Water,*
   336 S.W.3d 619 (Tex. 2011) ....................................................................... 16, 24

*Reliant Energy, Inc. v. Pub. Util. Comm'n,*
   153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied) ...................................16

*State Banking Board v. Allied Bank Marble Falls,*
   748 S.W.2d 447 (Tex. 1988) ............................................................................38

*Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*,
   665 S.W.2d 446 (Tex. 1984) (citing *Gerst v. Guardian Sav. & Loan
   Ass'n*, 434 S.W.2d 113 (Tex. 1968))............................................................ 15, 16

## STATUTORY AUTHORITIES

Tex. Gov't Code Ann. § 2001.174.................................................................15

Tex. Gov't Code Ann. § 2001.175.................................................................15

Tex. Util. Code Ann. § 36.061 ........................................................ 43, 44, 45

Tex. Util. Code Ann. §§ 36.402 ........................................................... 43, 44

Tex. Util. Code Ann.  §§ 39.011-.359 ..................................................... 1

Tex. Util. Code Ann. § 39.452......................................................... *passim*

Tex. Util. Code Ann. § 39.4525............................................................ 43, 44

Tex. Util. Code Ann. § 39.454.............................................................. 43, 44

Tex. Util. Code Ann. § 39.459.............................................................. 43, 44

Tex. Util. Code Ann. § 39.905............................................................ 26,27,28

## LEGISLATION

Act of May 24, 2005, 79th Leg., R.S., ch. 1072, § 1, 2005 Tex. Sess. Law
   Serv. 3559, available at
   http://www.legis.state.tx.us/tlodocs/79R/billtext/pdf/HB01567F.pdf ........ 1, 2, 24

Act of May 30, 2009, 81st Leg., R.S., ch. 1226, § 3, 2009 Tex. Sess. Law
   Serv. 3913, available at
   http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SB01492F.pdf.....................2, 24

# COMMISSION PROCEEDINGS

*Application of CenterPoint Energy Houston Electric, LLC for a Competition Transition Charge*, Docket No. 30706..............................................45

*Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule 25.344*, Docket No. 22355.................................................. 45, 46

*Complaint of the City of McKinney Against Southwestern Bell Telephone Company*, Docket No. 11027 ................................................................................45

*Petition of Texas Electric Service Co. for Authority to Change Rates,* Docket 2606, 5 P.U.C. BULL. 109 ....................................................................45

## STATEMENT OF THE CASE

This is an administrative appeal of an order of the Public Utility Commission of Texas (the Commission) in a contested-case proceeding. The order establishes a Competitive Generation Service (CGS) tariff, which would allow eligible customers to obtain their electricity from a supplier other than Entergy Texas, Inc. (ETI).

## STATEMENT ON ORAL ARGUMENT

To the extent the Court grants any request for oral argument, TIEC requests the opportunity to be heard.

## RESTATED ISSUES PRESENTED

(1) Whether the Commission's findings of fact regarding the costs that would be unrecovered as a result of the implementation of the CGS program are supported by substantial evidence and consistent with PURA § 39.452(b);

(2) Whether certain of ETI's litigation and regulatory expenses, which would have been incurred whether or not the Commission implemented a CGS tariff, and which were already being recovered in ETI's base rates, can be charged to ratepayers as CGS implementation costs through a special rider; and

(3) Whether PURA mandates that ETI receive interest on the costs of CGS implementation in the absence of any statutory reference to interest.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **AR, Supp. AR** | Administrative Record and Supplemental Administrative Record, organized by binders, exhibits, and transcripts |
| **CGS** | Competitive Generation Service, created by PURA § 39.452(b) |
| **CGSC Rider** | The Competitive Generation Service Costs Rider was designed to recover the costs of implementing and administering the program; approved by the PUC in Docket 39851 Order. |
| **CGSUSC Rider** | The Competitive Generation Service Unrecovered Costs Rider was first proposed by ETI in Docket No. 37744, but was not approved in either Docket 37744 or 38951. |
| **Commission or PUC** | Public Utility Commission of Texas |
| **EOC** | Entergy Operating Committee, the entity that conducts generation planning on behalf of ETI and its sister companies in other states. |
| **ETI** | Entergy Texas, Inc. |
| **LIPS** | "Large Industrial Power Service," the tariff schedule under which most of ETI's industrial customers take power. |
| **MW** | Megawatt, a measure of energy (equal to 1000 kilowatts) |
| **PFD** | Proposal for Decision |
| **PURA** | Public Utility Regulatory Act, Tex. Util. Code §§ 11.001 *et seq.* |
| **TIEC** | Texas Industrial Energy Consumers |

## STATEMENT OF FACTS

Appellee Texas Industrial Energy Consumers (TIEC) is an association of industrial consumers whose principal purpose is to address electricity matters at the Public Utility Commission ("the Commission").[1] TIEC files this brief in support of the Commission's order implementing a Competitive Generation Service ("CGS") tariff for Entergy Texas, Inc. ("ETI").

## I. The legislature delayed deregulation in ETI's service area, but took a small step towards competition by authorizing a CGS program.

ETI is an investor-owned utility that provides bundled generation, transmission, distribution, and customer service to retail customers in Southeast Texas.[2] In 1999, the legislature mandated that investor-owned utilities in Texas transition to competition.[3] The transition in ETI's service area, however, was not smooth.[4] Consequently, in 2005 the legislature enacted a special subchapter of PURA to specifically address ETI during the move to competition.[5] This subchapter applies to no other utilities.[6] The legislation removed the mandate that

---

[1] Supp. AR, Docket No. 37744, Item 2, Motion to Intervene of TIEC; AR Binder 1, Docket No. 38951, Item 46, List of Participating Members of TIEC.

[2] Supp. AR, Docket No. 37744, ETI Ex. 4, Domino Direct at 1.

[3] Tex. Util. Code Ann. ("PURA") §§ 39.011-.359.

[4] *See, e.g., In re Entergy Corp.*, 142 S.W.3d 316, 319-20 (Tex. 2004).

[5] Act of May 24, 2005, 79th Leg., R.S., ch. 1072, § 1, 2005 *Tex. Sess. Law Serv.* 3559) (HB 1567) (codified at PURA subch. J, §§ 39.451-39.463). This legislation can be accessed at http://www.legis.state.tx.us/tlodocs/79R/billtext/pdf/HB01567F.pdf.

[6] PURA § 39.451.

ETI proceed to a competitive market for generation, but still took a partial step toward competition by requiring ETI to propose a CGS tariff that would, if approved, allow eligible customers to obtain the generation of their electricity from another source.[7]

In 2009, the legislature amended this provision to statutorily delay ETI's transition to competition.[8] At the same time, however, the legislature reiterated the requirement that ETI propose a CGS tariff, adding additional instructions for implementation. The legislature also removed any requirement that the CGS tariff be proposed in a base rate case.[9]

The 2009 legislation is codified in PURA § 39.452. Section 39.452(b) authorizes a CGS tariff that, if approved by the Commission, would allow certain customers to purchase their electricity from a third party. ETI would continue to provide transmission service and other services, but the electricity itself would be generated and provided from another source.[10] The same section states that "the utility's rates shall be set, in the proceeding in which the tariff is adopted, to

---

[7] Act of May 24, 2005, 79th Leg., R.S., ch. 1072, § 1, 2005 *Tex. Sess. Law Serv.* 3559) (HB 1567).

[8] Act of May 30, 2009, 81st Leg., R.S., ch. 1226, § 3, 2009 *Tex. Sess. Law Serv.* 3913, 3914 (SB 1492) (codified at PURA § 39.452(i)). This legislation can be accessed at http://www.legis.state.tx.us/tlodocs/81R/billtext/pdf/SB01492F.pdf.

[9] *Id.* (codified at PURA § 39.452(b)), (removing "As part of a Subchapter C, Chapter 36, rate proceeding, the" from PURA § 39.452 (b)).

[10] PURA § 39.452(b).

recover any costs unrecovered as a result of the implementation of the tariff."[11]

The Commission's application of this provision is at issue in this appeal.

## II.    ETI proposed a CGS tariff in Commission Docket 37744.

ETI initially proposed a CGS program in Docket 37744, a base rate case, in 2009.[12] The Commission referred the case to the State Office of Administrative Hearings ("SOAH") to be tried by an administrative law judge ("ALJ").[13] ETI raised a number of issues with the costs it claimed would be unrecovered under the CGS tariff it submitted.[14] One such issue was ETI's witness's assertion that ETI would still be required to provide capacity to a CGS customer *even if that customer was purchasing its capacity elsewhere*.[15] That was because the Entergy Operating Committee ("EOC")—the entity that conducted generation planning on behalf of ETI and its sister companies in other states—would not recognize that a contract between the CGS customer and the CGS supplier would be a firm contract for ETI's planning purposes.[16] According to ETI, this meant that, despite the fact

---

[11] Id.

[12] Supp. AR, Docket No. 37744, ETI Ex. 1, Entergy Texas, Inc.'s Statement of Intent and Application for Authority to Change Rates and Reconcile Fuel Costs.

[13] Supp. AR, Docket No. 37744, Item 1, Order of Referral to State Office of Administrative Hearings (SOAH).

[14] Supp. AR, Docket No. 37744, Item 37, Proposal for Decision (PFD) at 26, ("…ETI has given the Commission a worst-case scenario of 75 million dollars in unrecovered costs if every eligible customer participates.").

[15] Supp. AR, Docket No. 37744, Item 21, Initial Brief of Entergy Texas, Inc. on Proposed CGS at 20-21; Supp. AR, Docket No. 37744, Transcripts, HOM Vol. D at 51-52.

[16] Supp. AR, Docket No. 37744, Item 37, PFD at 35-36.

that a CGS customer would be obtaining its electricity from an outside supplier, ETI would still be required to pay for generation capacity as if the CGS customer were actually buying its electricity from ETI.[17]

For whatever reason, ETI proposed no limits whatsoever on the number of customers or megawatts that could use CGS service, and then asserted that it could potentially lose all of the Large Industrial Power Service class ("LIPS") to the CGS program.[18] At the time, these customers represented 651 megawatts of ETI's total demand.[19]

The ALJ in Docket 37444 agreed with ETI that, under the CGS program ETI had proposed, ETI would still incur production costs to serve CGS customers despite the fact that these customers would obtain their electricity elsewhere, because the EOC would require ETI to buy capacity for these customers as if they were buying from ETI.[20] In light of this finding, and the fact that ETI's proposal would save no capacity costs but merely shift these costs to ETI's other customers,[21] the ALJ recommended that the CGS program ETI proposed in Docket

---

[17] Supp. AR, Docket No. 37744, Item 21, Initial Brief of Entergy Texas, Inc. on Proposed CGS at 20.

[18] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at 13.

[19] Id.

[20] Supp. AR, Docket No. 37744, Item 37, PFD at 36, FoF 44.

[21] Id. at FoF 17.

4

37444 be rejected altogether.[22]  It was unsurprising that ETI did not object to this recommendation.[23]

**III.  The parties agreed on a different CGS program in Docket 38951, but could not agree on what costs would be unrecovered as a result of its implementation.**

ETI's statement of facts describes in detail the CGS program it originally proposed in Docket 37444,[24] but it fails to describe the key elements of the program the Commission actually approved in Docket 38951, from which this appeal lies.  Because of this, one could be left with the impression that the program ETI proposed (and ultimately abandoned) in Docket 37444 is the CGS program at issue in this case.  However, the Commission did not approve that program. Instead, the Commission severed the CGS issues into Docket 38951 for further consideration.[25]  At the Commission's urging, the parties began settlement talks on a revised CGS program and subsequently agreed on a new approach.  The key element of this revised program was that the EOC would recognize that the CGS customer's electricity was being provided by a third party, not ETI.[26]  Thus, ETI

---

[22] Supp. AR, Docket No. 37744, Item 37, PFD at 41.

[23] Supp. AR, Docket No. 37744, Item 41, Exceptions of Entergy Texas, Inc. at 1.

[24] ETI's Appellant's Brief at 9.

[25] Supp. AR, Docket No. 37744, Item 53, PUC Order No. 14 – Memorializing Decision Granting Motion to Sever.

[26]ETI's agreement to do so was conditioned on certain conditions being met.  AR Binder 2, Docket No. 38951, Item 119, Final Order at Finding of Fact ("FoF") 41G.

would no longer have to incur any capacity costs to serve the CGS customer.[27] The parties also agreed that only a small amount of ETI's total load—a maximum of 115 megawatts—could participate in the CGS program.[28]

While the parties were able to agree on most of the previously contested issues surrounding the CGS program, they were not able to agree on what costs would be unrecovered as a result of its implementation.[29]  Accordingly, the parties submitted additional testimony on the costs that would be unrecovered under the new program, and the Commission held an evidentiary hearing to decide the issue.[30]

## IV.  The Commission found that the only costs that would be unrecovered as a result of implementation of the new CGS program were the costs to implement and administer it.

ETI maintained in Docket 38951 that it was entitled to recover lost revenues for every kilowatt that a CGS customer purchased from a source other than ETI, even though ETI would no longer have any obligation to provide generation for the

---

[27] Under the agreement, ETI would still provide back-up power when the CGS customer was unavailable.  The CGS customer would pay for this power.  AR Binder 4, Docket No. 38951, TIEC Ex. 15, Supplemental Direct Testimony and Exhibits of Jeffry Pollock at 15; AR Binder 2, Docket No. 38951, Item 119, Final Order at 19-20 (describing unserved energy rate and CGS cost distribution).

[28] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 36.

[29] *Id.* at 3-4.

[30] Id.

CGS customer.[31] Thus, despite the changes to the CGS program, ETI did not depart from the cost-recovery approach embodied in the rider it proposed in Docket 37744:

> This Competitive Generation Service Unrecovered Service Cost Rider ("Rider CGSUSC" or "Rider") defines the procedure by which Entergy Texas, Inc. ("Company") shall implement and adjust rates for *recovery of lost base rate revenue* resulting from customers participating in the Company's Competitive Generation Service ("CGS Program"). The purpose of this Rider is to provide a mechanism for *recovery of such lost base rate revenues* that were included in the Company's last general rate case proceeding before the Public Utility Commission of Texas ("PUCT").[32]

In a nutshell, ETI contended that it was entitled to recover the hypothetical revenues (or "embedded generation costs" as ETI uses the term[33]) that a CGS customer would have paid if it had purchased its electricity from ETI instead of from a third party.[34]

Other parties disagreed that ETI was entitled to lost revenues and submitted testimony that the revised CGS tariff *would cost ETI nothing from a capacity*

---

[31] AR Binder 2, Docket No. 38951, Item 119, Final Order at 7; AR Binder 3, Docket No. 38951, ETI Ex. 91, May Supp. Direct at 5-8.

[32] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at Exhibit PRM-1 at 5 (emphasis added); *see also* AR Binder 5, Transcripts Vol. B, HOM Tr. At 72-73 (Apr. 19, 2012); AR Binder 3, Docket No. 38951, ETI Ex. 91, May Supp. Direct at 5-8.

[33] ETI's Appellant's Brief at 8 (stating that the CGSUSC Rider would have recovered embedded generation costs that "migrating customers" would have paid but for CGS program).

[34] Supp. AR, Docket No. 37744, Item 37, PFD at 22-13 and FoFs 14-18; Supp. AR, Docket No. 37744, Transcripts, Vol. D at 165-166 (Jul. 16, 2010).

***standpoint.***[35] The testimony submitted by intervenor witnesses was that, under the new framework, a CGS supplier would be required to enter into a purchase agreement directly with ETI (or on ETI's behalf) under which the supplier would provide ***firm*** power to a CGS customer.[36] The CGS supplier's charges to provide the power would be passed directly through to the CGS customer.[37] And ETI's other costs of serving CGS customers, such as costs to provide transmission service and back-up power, would be charged to the very CGS customers who received those services.[38] Thus, in addition to being presented with several stipulations regarding the structure of the agreed-to CGS program,[39] the Commission heard intervenor testimony that, under this framework, the CGS customer would pay ETI for the full cost of all of the service that ETI provides that customer, and the CGS customer would pay the CGS supplier for the cost of the power that the CGS supplier provides.[40]

Additionally, the stipulations presented to the Commission provided that the CGS customers would pay ETI's incremental cost of implementing and

---

[35] *See, e.g.,* AR Binder 3, Docket No. 38951, Cities Ex. 6C, Nalepa Supp. Direct at 7-8; AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 14-21.

[36] *Id.*

[37] *Id*.

[38] Id.

[39] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 12-18.

[40] AR Binder 3, Docket No. 38951, Cities Ex. 6C, Nalepa Supp. Direct at 10; AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 16.

administering the CGS program.[41]  Although those costs were unknown at the time of the hearing, the Commission (with ETI's agreement) ordered that ETI could subsequently file an application to recover them.[42]

After considering the testimony, stipulated facts, agreements, and multiple rounds of briefing, the Commission made the following ultimate finding of fact as to unrecovered costs associated with the revised CGS program tariff then before it:

> The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.[43]

The Commission also rejected ETI's assertion that it was entitled to charge other ratepayers for the difference between what a CGS customer paid and what a full firm LIPS customer would have paid,[44] which ETI had characterized as "lost base rate revenues" in its proposed rider in Docket 37744.[45] After this Court rejected a similar lost revenues argument in *CenterPoint Energy Houston Electric, LLC v. Public Utility Commission* ("*CenterPoint 2011*"),[46] ETI downplayed the "lost revenues" language in its proposal, and instead used the terms "embedded

---

[41] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 35.

[42] *Id.*

[43] Supp. AR, Docket No. 37744, Item 27, SOAH Order No. 12 – Interim Order Approving Revised Interim Rates at FoF 40; AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 51.

[44] AR Binder 2, Docket No. 38951, Item 119, Final Order at CoL 2.

[45] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at Exhibit PRM-1 at 5.

[46] 354 S.W.3d 899 (Tex.App.—Austin 2011, no pet.).

9

generation costs" or "embedded production costs."[47]  But ETI's witness made clear that they were the same thing.[48]  Whatever the lexicon, the Commission rejected ETI's argument that the statutory reference to unrecovered costs meant lost revenues.  Specifically, the Commission made a conclusion of law that:

> PURA § 39.452(b) does not allow for the recovery of lost revenue or embedded generation costs.[49]

The Commission's order cited this Court's decision in *CenterPoint 2011* as precedent in support of its determination that PURA § 39.452(b)'s reference to "costs unrecovered" did not mean "lost revenues."[50]

## V.  The Commission rejected ETI's proposal to surcharge pre-implementation CGS regulatory expenses and denied ETI's request for interest on costs of implementing a CGS program.

ETI also proposed a "CGSC" rider that was to recover the company's incremental development and ongoing CGS program operation costs, under the theory that these costs would otherwise be unrecovered as a result of the implementation of the CGS tariff.[51]  ETI sought to surcharge ratepayers for its alleged historical CGS regulatory and litigation expenses dating back to November

---

[47] AR Binder 3, Docket No. 38951, ETI Ex. 91, May Supp. Direct at 5-8; *See, e.g.,* ETI's Appellant's Brief at 8, 15.

[48] AR Binder 5, Transcripts, Vol. B, HOM Tr. At 72-73.

[49] AR Binder 2, Docket No. 38951, Item 119, Final Order at CoL 2.

[50] *Id.* at 7.

[51] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at Exhibit PRM-1 at 3; PURA § 39.452(b).

10, 2010—years before any decision of whether there would even be a CGS tariff to implement.[52] These costs would have been incurred even if the Commission had denied the proposal to implement a CGS program in its July 2013 final order at issue in this appeal. The Commission denied ETI's request and determined that the costs of implementing the CGS program tariff would begin if and when a CGS program was implemented.[53] The Commission also determined that ETI was not entitled to interest on any costs of implementing a CGS program.[54]

ETI appealed the Commission's order in Docket 38951 to district court.[55] Following full briefing and oral argument, the trial court, Judge Meachum presiding, affirmed the Commission's order in all respects.[56] ETI then filed this appeal.

## SUMMARY OF ARGUMENT

PURA § 39.452(b) states that a utility's rates "shall be set . . . to recover any ***costs unrecovered*** as a result of the implementation of the tariff."[57] The evidence showed that under the revised CGS tariff approved by the Commission, ETI would not incur any costs to serve CGS customers that would be ***unrecovered***, other than

---

[52] AR Binder 3, Docket No. 38951, ETI Ex. 103, Roach Supp. Reb. at 2:19-21.
[53] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 51.
[54] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 57.
[55] CR4-19.
[56] CR523-26.
[57] Emphasis added.

11

as-yet unquantified implementation and administration costs. The revised program required that the CGS supplier, not ETI, would provide firm power to serve the CGS customer. Thus, unlike the program initially proposed in Docket 37744, ETI would not have any capacity costs associated with CGS customers. ETI would indisputably incur costs to provide back-up power, transmission, and other ancillary services to CGS customers. However, under the framework approved by the Commission, all of these costs would be charged to those CGS customers and would thus not be "unrecovered."

ETI contends that it has unavoidable fixed production costs, and asserts that these should be considered unrecovered costs.[58] As an initial matter, ETI did not propose to measure and recover any fixed production costs that would somehow be unrecovered as a result of the CGS program. It simply sought revenues that it would have hypothetically charged if any future CGS customer had chosen to buy full firm power from ETI rather than from CGS suppliers. Further, the evidence contradicts ETI's claim. ETI purchases, rather than self-generates, the vast majority of the power it supplies to its retail customers,[59] and it is projecting substantial capacity shortfalls in the coming years.[60] ETI also projects steady

---

[58] ETI Appellant's Brief at 15-16.
[59] Supp. AR, Docket No. 37744, Item 37, PFD at 31.
[60] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 42, 43.

growth in demand in its service area.[61]   And, under the revised CGS framework approved by the Commission, the program was capped at 115 MW.   Taken together, these facts mean that the implementation of the CGS program would not result in any load loss; it would merely slow ETI's load growth and thus ameliorate ETI's capacity shortfall.[62]   In other words, even if one assumes that all future CGS customers would have taken full firm power from ETI (rather than, for example, self-generating power or locating in another utility's service territory), the CGS program would merely cause ETI to purchase less electricity than it otherwise would have.

The Commission also properly rejected ETI's position that by "costs unrecovered," the legislature actually meant "lost revenues."  The plain language of the statute makes no reference to revenues, and this Court's decision in *CenterPoint 2011* confirms that a reference to "costs" in PURA does not mean "revenues."

ETI attempts to distinguish the *CenterPoint 2011* holding by asserting that it sought to recover its "embedded production costs."  However, this contention is belied by the language of ETI's proposed rider, in which ETI expressly sought recovery of "lost base rate revenues," not unrecovered costs.  It is also belied by

---

[61] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 22, JP-3 (citing Entergy's Strategic Resource Plan).

[62] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 9.

13

the evidence, including testimony from an ETI witness that ETI sought to recover all revenues it would have received if a CGS customer that purchased power from a third party had instead purchased power under ETI's full firm rates, even if that customer had never purchased power from ETI prior to signing up for the CGS program. The hypothetical *revenue* a new customer might have generated from ETI if it had chosen to purchase power from ETI under a firm rate cannot logically be considered an unrecovered *cost* to ETI. It is clear that ETI proposed a lost-revenues theory that is foreclosed by PURA and *CenterPoint 2011*.

The Commission properly found that ETI will incur costs to implement and administer the CGS program, which will not be recovered by the CGS tariff itself. Accordingly, the Commission determined that these costs were unrecovered costs and provided a mechanism for their recovery. The Commission's determination that these were the only costs that would be unrecovered is supported by the evidence, consistent with the plain language of the implementing statute, and faithful to this Court's recent precedent in *CenterPoint 2011*.

The Commission's denial of ETI's request to surcharge customers for regulatory costs incurred from November 2010 to July 2013 as costs of implementation should also be upheld. These costs would have been incurred regardless of whether the CGS program was ever implemented, and, under the

14

statute, ETI may only recover costs that are unrecovered as a result of implementation. Further, the record showed that ETI actually sought and was recovering pre-implementation costs related to the CGS program through its base rates.

Finally, the Commission properly rejected ETI's request to recover interest on the costs of CGS implementation. Contrary to ETI's claim that it is statutorily entitled to interest, the statute makes no reference to carrying costs, and the Commission has long denied interest on similar regulatory expenses.

## ARGUMENT

### I. The Commission's finding on ETI's unrecovered costs is supported by substantial evidence and consistent with the CGS statute.

#### A. Standard of Review

Judicial review of the Commission's findings of fact concerning unrecovered costs is under the substantial evidence rule.[63] The substantial evidence standard of review does not allow a court to substitute its judgment for that of the agency.[64] The scope of review under the substantial evidence rule is limited; the issue for the reviewing court is not whether the agency reached the correct conclusion, but whether there is "some reasonable basis in the record for

---

[63] PURA § 15.001; Tex. Gov't Code §§ 2001.174, 2001.175.

[64] *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984) (citing *Gerst v. Guardian Sav. & Loan Ass'n*, 434 S.W.2d 113, 115 (Tex. 1968)).

the action taken by the agency."[65] Substantial evidence requires only more than a mere scintilla, and "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence."[66] A court must uphold an agency decision if a reasonable basis exists in the record for the decision.[67]

ETI also argues that the Commission misconstrued the terms of § 39.452 of PURA. A reviewing court gives great weight to the agency's interpretation of the statute it implements and enforces.[68] If a statute is subject to more than one interpretation, a court must uphold the agency's interpretation if it is reasonable and in harmony with the statute.[69]

> **B.      The evidence showed that ETI would not incur any costs to serve CGS customers that would be unrecovered, other than implementation and administration costs.**

To understand the CGS program, it is helpful to draw an analogy. Consider a natural gas utility that provides service to an industrial consumer under a firm contract. Prior to deregulation, the gas utility would generally purchase or produce

---

[65] *See City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994).

[66] *Charter Med.-Dallas*, 665 S.W.2d at 452 (citing *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977)).

[67] *See City of El Paso*, 883 S.W.2d at 185.

[68] *Reliant Energy, Inc. v. Pub. Util. Comm'n*, 153 S.W.3d 174, 187 (Tex. App.—Austin 2004, pet. denied).

[69] *R.R. Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011).

the natural gas and then transport it to the customer on the utility-owned pipeline. However, if a CGS-style program were introduced, the customer could choose to purchase its natural gas from a third party, but it would still pay to have it shipped on the utility's pipeline. Logically, this should result in the utility avoiding the costs necessary to either purchase or produce the gas that the customer was no longer buying from the utility. However, if there were some overarching requirement that the utility was still responsible for buying natural gas for the customer even though the customer was obtaining it elsewhere, the utility might argue that it could not avoid its costs to provide gas to the customer. This is essentially what ETI argued in connection with the CGS program it initially proposed in Docket 37744.

The key impediment to the CGS program proposed in that docket was the insistence by ETI and the Entergy Operating Committee that ETI would still have to incur production costs for a CGS customer even though that customer was not obtaining its electricity from ETI.[70] Critically, this impediment was resolved under the approach the Commission adopted in Docket 39851, because the revised program allowed the CGS customer to get its firm power from the CGS supplier without cost to ETI. The evidence established that this and other changes to the

_____

[70] Supp. AR, Docket No. 37744, Item 21, Initial Brief of Entergy Texas, Inc. on Proposed CGS at 20.

17

CGS program meant that ETI would not incur production costs to serve CGS customers.

TIEC witness Jeffry Pollock[71] testified that, under the revised CGS program, the CGS customer would pay ETI for *all* costs associated with its service.[72] For example, even though the CGS customer would use an alternative source for its generation supply, it would still use the ETI transmission and distribution system to deliver the electricity. For this use, the CGS customer would pay ETI the full wires charges that any other electricity user in the ETI area would pay.[73] And, since there may be times when the CGS supplier experiences an outage, the CGS customer would pay ETI the full cost of back-up power, just as a customer that self-generates its own power would pay ETI for back-up power.[74] In short, ETI would not incur any production costs to serve the CGS customer that it would not recoup. As stated by Cities witness Karl Nalepa, "[t]he current CGS program has been designed such that no production costs need go unrecovered."[75]

---

[71] Mr. Pollock's pre-filed testimony on unrecovered costs under the revised CGS program in Docket No. 38951 is attached to this brief for the Court's reference.

[72] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 15.

[73] *Id*.

[74] *Id*. *See also* AR Binder 2, Docket No. 38951, Item 119, Final Order at 19-20 (describing Unserved Energy rate and CGS Fixed Cost Contribution).

[75] AR Binder 3, Docket No. 38951, Cities Ex. 6C, Nalepa Supp. Direct at 10.

**C.    ETI did not prove that it has unavoidable fixed generation costs that would be unrecovered as a result of the CGS program.**

ETI argues in its brief that its costs of generation are fixed and do not change with changes in demand.[76] The crux of ETI's argument is that implementing the CGS program will cost ETI money in the form of generation costs that neither the CGS customer nor any other customer will pay.[77] As an initial matter, ETI did not submit to the Commission a rider that would have measured any such "unrecovered" generation costs. The rider ETI submitted sought, by its own terms, "***lost base rate revenue*** resulting from customers participating in the [CGS program]."[78] Further, the evidence showed that ETI would not have any unavoidable fixed production costs that would be unrecovered.

ETI is a "short" utility—it has relatively little capacity in the form of ETI-owned power plants.[79] Accordingly, to satisfy its obligation to serve, ETI purchases the vast majority of its capacity in the wholesale market and resells that capacity to its retail customers.[80] In addition, ETI purchases capacity each month

---

[76] *See* ETI's Appellant's Brief at 8, 15.

[77] Id.

[78] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at Exhibit PRM-1 at 5 (emphasis added).

[79] Supp. AR, Docket No. 37744, Item 37, PFD at 31.

[80] *See* Docket No. 37744, Schedule P-6.1 and Schedule H-12.4a-g. ETI submitted that it had $124,341,000 in generated capacity cost and another 186,534,000 (IPCR - Capacity Rider of $25,769,780 + Other - Base Rate Costs of $160,764,523) in purchased capacity cost for a total of $310,875,000 in capacity costs.

from its affiliates based on ETI's actual capacity shortfall in the month.[81] Thus, when ETI has additional demand from its customers, it must purchase additional power. Conversely, if an existing customer leaves the system or becomes a CGS customer, ETI would no longer need to purchase capacity for that customer. And if a customer new to ETI's service area signed up for CGS service, ETI would not have to purchase any additional power whatsoever to serve that customer.

The evidence also showed that ETI was experiencing considerable "load growth" (or increased demand for electricity).[82] Based on an assessment of both its load requirements and generating capability, ETI projected a capacity shortfall going forward.[83] In fact, ETI stipulated that it would have a shortfall of 260 MW in 2012, which would grow to 506 MW by 2013.[84] This evidence was significant given that the revised CGS program was limited to a maximum of 115 MW.[85] With the cap, the CGS program—even if fully subscribed—would do no more than slow ETI's projected load growth and reduce ETI's need to purchase additional

---

[81] Supp. AR, Docket No. 37744, Item 37, PFD at 31.

[82] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 22, JP-3 (citing Entergy's Strategic Resource Plan).

[83] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 42, 43.

[84] *Id.* at FoF 43.

[85] *Id*. at FoF 36.

capacity.[86]  Because a CGS customer would obtain its own electricity supply, ETI could use its existing generation resources to serve existing and new non-CGS load.[87]  As Mr. Pollock testified, "ETI has been experiencing substantial load growth, and the addition of a CGS Program with a cap would only have the effect of slowing the load growth, not reducing ETI's revenues."[88]

In sum, the evidence showed that the CGS program, whether comprised of new load, existing LIPS customers, or some combination thereof, would do no more than to reduce the additional amount of power that ETI would have to purchase to serve its system in the future.  ETI's brief suggests that CGS customers would somehow get a "free lunch" at ETI's expense.[89]  As demonstrated by the foregoing, however, under the program adopted by the Commission, CGS customers would buy their lunch from the CGS suppliers and relieve ETI of the need to buy lunch on their behalf.

---

[86] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 21-23.  The evidence in the underlying proceeding showed that ETI projected load growth of about 2 percent, or 80 megawatts per year, through 2029.

[87] *Id*. at 24.

[88] *Id*. at 9.

[89] ETI Appellant's Brief at 19.

**D.** **The Commission properly determined that the costs to implement and administer the CGS tariff would be unrecovered and included this finding in its order.**

The evidence showed that the only costs that would be unrecovered as a result of the implementation of the program were implementation and administrative costs.[90] Intervenor witnesses testified that ETI could recover these incremental CGS start-up and implementation costs,[91] and ETI agreed to seek these costs in an application in a subsequent proceeding.[92] Mr. Pollock's testimony made clear that there would be no other unrecovered costs:

> Q    Would any unrecovered costs exist after start-up, on-going and backup power costs are paid by the CGS customer?
>
> A    No. Recall that, under the CGS Program described in the Stipulation, the CGS Customer would effectively buy its own capacity and energy from the CGS Supplier. With the exception of the capacity credit and fixed fuel factor, a CGS Customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer, including a transmission and distribution rate and all other applicable tariffs (e.g., Rider TTC, HRC, SRC, SCO, AFC and FF charges, if applicable). There would be no other unrecovered costs.[93]

---

[90] AR Binder 2, Docket No. 38951, Item 119, Final Order at 8.
[91] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 15.
[92] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 54A.
[93] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 16.

22

ETI had the burden of proving that additional costs beyond those found by the Commission would be unrecovered.[94]  It failed to do so.  The Commission's finding that the only costs that would be unrecovered were those to implement and administer the tariff is supported by substantial evidence and should be upheld.

**E.**	**The Commission properly rejected ETI's attempt to recast the statutory term "costs unrecovered" as lost revenues.**

While the Commission made a factual finding on the basis of extensive evidence, it also rejected ETI's proposed interpretation of the statute that would equate "costs unrecovered" with the hypothetical lost revenues that a CGS customer would have paid had it chosen to purchase electricity under ETI's LIPS rate instead.  The Commission's decision is consistent with the plain language of the statute, which provides that the utility's rates will be set "to recover any ***costs*** unrecovered as a result of the implementation of the tariff.[95]

**1.**	**The Commission's interpretation is consistent with the plain language of PURA § 39.452(b).**

Common definitions of "cost" are "the amount of money that is needed to pay for or buy something" and "expenditure."[96]  As set out above, the Commission carefully examined the expenditures that ETI would incur as a result of the

---

[94] PURA § 36.006.

[95] PURA § 39.452(b) (emphasis added).

[96] Definition of "cost", Merriamwebster.com, http://www.merriam-webster.com/dictionary/cost (last visited Feb. 12, 2015).

program, but the record showed that ETI would not incur production expense or any other types of costs that would **not** be recovered (other than costs to implement and administer). Accordingly, the Commission's decision is entirely consistent with the plain language of PURA § 39.452(b). Further, to the extent there is any ambiguity in the statute with respect to whether the statutory term "any costs unrecovered as a result of" includes lost revenues, the Commission's determination is reasonable and is therefore entitled to deference.[97]

ETI argues that the framework of § 39.452(b) somehow plainly indicates that, because unrecovered costs must be ascertained in the same proceeding in which the CGS tariff is approved, these "costs" must be based on the test year used to set base rates.[98] But ETI fails to point out that there is no requirement that the Commission implement the CGS program in a base rate case in which test year expenses and revenues are determined. The 2009 amendments to the CGS statute removed the requirement that the CGS tariff be set in a rate case.[99] As amended, the statute mandates that the Commission consider a CGS tariff by a date certain,

---

[97] *Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 629. Notably, the ALJ in Docket No. 37744 concluded that this term was vague. Supp. AR, Docket No. 37744, Item 37, PFD at 30.

[98] ETI's Appellant's Brief at 17.

[99] *Compare* Act of May 24, 2005, 79th Leg., R.S., ch. 1072, § 1, 2005 *Tex. Sess. Law Serv.* 3559) (HB 1567) *with* PURA § 39.452(b); *see also* Act of May 30, 2009, 81st Leg., R.S., ch. 1226, § 3, 2009 *Tex. Sess. Law Serv.* 3913, 3914 (SB 1492) (codified at PURA § 39.452(i)).

24

whether or not ETI filed a rate case.[100] So any notion of a base rate test year is absent from § 39.452(b).

Further, ETI fails to explain how a bare reference to "costs that would be unrecovered as a result of implementation of the tariff" correlates to a utility's test year revenue requirement in some imagined rate case. ETI's attempt to assert some statutory link between unrecovered costs and some unidentified rate case test year is without merit.

### 2. The Commission's decision is consistent with the *CenterPoint 2011* precedent.

Had the legislature intended that ETI be permitted to charge customers for hypothetical lost revenues, it would have so stated. This is the crux of this Court's decision in *CenterPoint 2011*. In that case, CenterPoint, ETI, and other utilities challenged one of the Commission's energy efficiency rules,[101] which was intended to encourage residential and commercial customers to reduce their usage through energy efficiency measures.[102] ETI and the other utilities argued that they should be allowed to charge customers for their lost revenues resulting from energy

---

[100] PURA § 39.452(b).

[101] *Centerpoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App.—Austin 2011, no pet.).

[102] *Rulemaking Proceeding to Amend Energy Efficiency Rules,* Project No. 37623, Order at 1 (Aug. 9, 2010).

25

efficiency measures.[103]   The Court held, however, that in those rare instances in which the legislature intended to allow a utility to charge ratepayers for a loss in revenue, it has explicitly provided for recovery of a "loss of revenue" or a "decrease in revenue."[104]   The Court therefore upheld the Commission's order denying a lost revenue adjustment mechanism very similar to the one proposed by ETI here, explaining:

> The legislature's failure in PURA section 39.905 to specifically provide for recovery of "lost revenues," in addition to "costs," indicates that it intended for the EECRF [Energy Efficiency Cost Recovery Factor] to serve as a mechanism for a utility to recover out-of-pocket expenditures associated with its implementation of energy-efficiency programs, not to compensate a utility for any associated lost revenues attributable to those programs.[105]

As the Court observed, "[i]n at least two other provisions of PURA, the legislature expressly distinguishes 'costs' from 'revenues,' indicating that its use of the term 'costs' by itself does not encompass lost revenues."[106] The Court noted that "PURA section 55.024(b) provides that a telecommunication utility may recover 'all costs incurred ***and all loss of revenue*** resulting from imposition of charges for providing mandatory two-way extended area service to customers."[107]

---

[103] AR Binder 4, Docket No. 38951, TIEC Ex. 24, Amicus Curiae Brief of Entergy Texas, Inc., El Paso Electric Company and Southwestern Electric Power Company at 3.

[104] *CenterPoint 2011*, 354 S.W.3d at 903-04.

[105] *Id*. at 904.

[106] *Id*. at 903-04.

[107] *Id*. at 904 (emphasis in original).

26

Similarly, "in PURA section 56.025(e), the legislature directed the Commission to 'implement a mechanism to replace the reasonably projected increase in costs *or decrease in revenue*' caused by a governmental agency's order, rule, or policy."[108] The Court concluded that, since the legislature expressly provided for recovery of lost revenue when that was the intent, the absence of such language in the energy efficiency provisions compelled the conclusion that such intent was absent.[109]

The Commission reasonably relied on this precedent. The Commission found that, like the statutory language regarding energy efficiency cost recovery in PURA § 39.905, "PURA § 39.452(b) only provides for 'costs unrecovered as a result of implementation of the tariff' and does not specifically provide for the utility to recover lost revenues or any other types of costs."[110] The Commission's interpretation of the statute was consistent with the statutory language, reasonably based on the evidence, and consistent with the *CenterPoint 2011* precedent.

ETI's attempts to distinguish the *CenterPoint 2011* decision are unavailing. ETI first tries to diminish the Third Court's precedent by distinguishing the energy efficiency statute, PURA § 39.905, from PURA § 39.452(b) on the basis that the EECRF statute, PURA § 39.905, authorizes "cost recovery for utility *expenditures*

---

[108] *Id*. at 904 (emphasis in original).
[109] *Id*. at 903-04.
[110] AR Binder 2, Docket No. 38951, Item 119, Final Order at 8.

27

made to satisfy the goal of this section . . .," whereas the CGS statute, PURA § 39.452(b), requires that "rates shall be set . . . to recover any **costs** unrecovered as a result of the implementation of the tariff."[111] ETI ignores that the words *costs* and ***expenditures*** are synonyms.[112] It also ignores the simple point of the *CenterPoint 2011* decision: when the legislature has intended to allow recovery for lost revenues, it has expressly stated as much.

Indeed, the arguments that ETI unsuccessfully made in *CenterPoint 2011* bear a striking resemblance to its contentions here. ETI's chief point in both cases was that the legislature created a program that will (i) cause ETI implementation costs and (ii) allegedly result in lost revenues because of reduced demand caused by the program. In *CenterPoint 2011*, ETI argued:

> PURA section 39.905 requires electric utilities to incur two kinds of costs: the cost of the utilities' expenditures on energy efficiency programs implemented under the statute, and the value of lost revenue recovery due to depressed revenues that result from energy efficiency measures.[113]

Here, ETI asserts:

> This new "competitive generation service" or "CGS" program costs ETI money to develop and administer. It also costs ETI money in that the CGS program permits eligible customers to contract for electric

---

[111] ETI's Appellant's Brief at 22, 23 (emphases added).

[112] Definition of "cost", Merriam-Webster.com, http://www.merriam-webster.com/dictionary/cost (last visited Feb. 12, 2015).

[113] AR Binder 4, Docket No. 38951, TIEC Ex. 24, Amicus Curiae Brief of Entergy Texas, Inc., El Paso Electric Company and Southwestern Electric Power Company at 2.

generation resources from alternative suppliers, which allows them to avoid paying some of ETI's costs that would otherwise be allocated to them under ETI's base rates.[114]

In both cases, ETI argued that it should not only be entitled to the costs to implement and administer the program at issue, but also to the revenues it would have received in its absence. And in both cases, ETI argued that if the Commission does not allow it to recover its lost revenues, it will be deprived of the opportunity to recover its reasonable and necessary expenses.[115] The only real difference between ETI's approach in the two cases is its choice of nomenclature.

In *CenterPoint 2011*, ETI openly referred to its desire to recover "lost revenues," whereas in this case ETI frames the issue as one of "fixed production costs,"[116] "embedded generation costs,"[117] or "embedded production costs."[118] It is abundantly clear, however, that ETI is still referring to lost revenues. The Court properly rejected ETI's claim for lost revenues in *CenterPoint 2011*, and it should do the same here.

---

[114] ETI Appellant's Brief at 6.

[115] AR Binder 4, Docket No. 38951, TIEC Ex. 24, Amicus Curiae Brief of Entergy Texas, Inc., El Paso Electric Company and Southwestern Electric Power Company at 4; ETI Appellant's Brief at 28.

[116] ETI Appellant's Brief at 23.

[117] *Id.* at 9.

[118] *Id.* at 15.

### 3. ETI sought lost revenues at the Commission, not unrecovered costs.

Relatedly, ETI tries to distinguish the *CenterPoint 2011* case with its claim that it "indisputably" sought only "costs" here,[119] when in fact that very claim was hotly contested and ultimately rejected by the Commission.[120] What ETI characterized as costs, were, according to multiple witnesses, simply its lost revenues.[121] Relying on the PFD from Docket 37744, ETI states that "[n]one of the experts in this case disputed that the CGS program could lead to unrecovered 'costs' *of the type claimed by ETI*."[122] Notably, ETI's citation is to testimony concerning the program initially proposed by ETI in Docket 37744 under which the EOC required ETI to provide capacity for CGS customers even though they were buying their electricity elsewhere.[123] Multiple witnesses testified that the *revised* CGS program in Docket 38951—the program that was actually approved—would not result in any *costs* that would be unrecovered as a result of the program.[124] Mr. Pollock, for example, testified that under the CGS program

---

[119] ETI's Appellant's Brief at 24.

[120] AR Binder 2, Docket No. 38951, Item 119, Final Order at 7-8.

[121] AR Binder 3, Docket No. 38951, Cities Ex. 6C, Nalepa Supp. Direct at 3, 7-8; AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 14-15.

[122] ETI's Appellant's Brief at 25 .

[123] *Id*. at n. 35.

[124] AR Binder 3, Docket No. 38951, Cities Ex. 6C, Nalepa Supp. Direct 3, 7-8; AR Binder 4, Docket No. 38951, TIEC Ex. 27, Pollock Second Supp. Direct at 14-15.

adopted by the Commission, "no unrecovered costs would exist that need to be allocated to other customers and customer classes."[125]

Indeed, ETI's claim that it sought "costs" is based on its post-*CenterPoint 2011* attempt to frame the relief it sought at the Commission as its "embedded production costs" rather than its lost revenues. The term "embedded generation costs" does not appear anywhere in PURA or the Commission's Rules.[126] By "embedded," ETI means the "costs" that are contained in its rates. And when ETI refers to "embedded generation costs," it is not referring to costs that it incurs because of the CGS program, but instead to the hypothetical revenues it will lose if new customers buy CGS power instead of ETI's power, or if existing customers stop buying electricity from ETI. ETI essentially concedes as much in its brief.[127]

That ETI sought lost revenues is also evident from the CGSUSC rider ETI proposed in Docket 37744. As noted, ETI's stated purpose for its proposed CGSUSC rider was to "adjust rates for *recovery of lost base rate revenue* resulting from customers participating in the [CGS progam]."[128] If that were not clear enough, ETI's witness Phillip May testified that ETI considered itself entitled to

---

[125] AR Binder 4, Docket No. 38951, TIEC Ex. 15, Pollock Supp. Direct at 8.

[126] Nor does "embedded production costs."

[127] ETI's Appellant's Brief at 24-26 (stating, for example: "What would have been billed may logically be termed 'revenues'").

[128] Supp. AR, Docket No. 37744, ETI Ex. 9, May Direct at Exhibit PRM-1 at 5.

lost revenues from CGS sales whether or not the utility had ever incurred production costs to serve a CGS customer:

> Q Okay. So your proposal for the CGSUSC Rider is to calculate the difference between what would have billed - - been billed under traditional LIPS service and the amounts collected under the CGS service?
>
> A That's a fair characterization.
>
> Q Okay. So let me get this straight. Under the company's proposal, if a brand-new industrial customer came to you that had never received service from ETI and they said, "We want to sign up for CGS," ETI would still seek to recover lost revenues based on LIPS from that customer?
>
> A Yeah, I believe that is consistent with the program . . . . [129]

Mr. May's testimony lays bare that ETI is attempting to recover revenues regardless of whether it has ever incurred any cost to serve or even planned to serve a customer. The Commission saw ETI's use of "embedded generation costs" for what it was—an attempt to repackage a lost revenue-theory that is foreclosed by the plain language of PURA § 39.452(b) and *CenterPoint 2011*.

---

[129] Supp. AR, Docket No. 37744, Transcripts, Vol. D, HOM Tr. at 165:23-166:11 (Jul. 16, 2010). Mr. May confirmed at the Commission's April 19, 2012 evidentiary hearing that ETI sought the same lost-revenues relief in Docket No. 38951 that it sought in Docket No. 37744. Tr. At 72-73; *see also* AR Binder 3, Docket No. 38951, ETI Ex. 91, May Supp. Direct at 5-8.

### 4. The Commission's rejection of ETI's lost-revenues theory is consistent with the purposes of the CGS statute.

ETI's proposal is also inconsistent with the purposes of the CGS program. Two of the legislative purposes for the program were to provide the industrial base in ETI's region with some opportunity to shop for more competitive power, and to ensure that residential customers were well served.[130] ETI's proposal that it be permitted to recover hypothetical lost revenues detached from any cost it actually incurs as result of the CGS program serves neither purpose. As ETI is at pains to point out in its brief, if it is entitled to recover these revenues, someone will have to pay for them. If it is all customers other than the CGS participants that must pay, this will harm the legislative goal that residential consumers be served well. If the CGS participants themselves were charged for the very revenues that ETI would have collected but for their decision to take CGS service, there would, needless to say, be no incentive to sign up.

As the Commission recognized, ETI's interpretation of the statute is unreasonable and would only serve to torpedo the entire program. For example, at the evidentiary hearing on the revised CGS program in Docket 38951, Chairman Donna Nelson stated:

---

[130] Supp. AR, Docket No. 37744, Item 19, Initial Brief of TIEC, Attachment 1, Transcript of Proceedings before the Texas State Senate 81st Legislature, Senate Committee on Business and Commerce, at 9-10 (Apr. 14, 2009). Video of the proceedings can be found at http://www.senate.state.tx.us/75r/senate/commit/c510/c510.htm.

Well, and I guess I would say I'm not going to say this is my final conclusion, but I would say it would seem to me that if you follow Entergy's logic in this case, you would end up with an absurd result and a program that doesn't work. So I'm not going to say one way or the other because I'm certainly going to review everything, but I can't see how you arrive at any other conclusion.[131]

Chairman Nelson's concerns with ETI's lost-revenues proposal were well placed. The Commission properly rejected it.

### 5.    *High Plains* is inapposite.

ETI's reliance on the *High Plains Natural Gas* case to justify its position is misplaced.[132] *High Plains Natural Gas*, which was decided more than thirty years ago, did not fundamentally alter PURA Chapter 36's ratemaking framework. The case does not stand for the proposition that utilities may recover lost revenues or costs they do not incur. Rather, in *High Plains Natural Gas*, the Texas Supreme Court examined the issue of whether PURA allowed the Railroad Commission to utilize a purchase gas adjustment to compensate for increased fuel costs after a base rate case had concluded. Examining a PURA article that stated "[i]n fixing the rates of a public utility the regulatory authority shall fix its overall revenues at a level which will permit such utility to recover its operating expenses together with a reasonable return on its invested capital," the court held that this "mandates that

---

[131] AR Binder 5, Docket No. 38951, Transcripts, Vol. B, HOM Transcript at 207-208 (Apr. 19, 2012).

[132] ETI Initial Brief at 18-19 (discussing *R.R. Comm'n v. High Plains Natural Gas Co.*, 628 S.W.2d 753 (Tex. 1981) (per curiam)).

the Commission structure a system that will permit the utility to recover all of its operating expenses."[133]  The Public Utility Commission has done this through its Chapter 36 ratemaking process, which has been in place for many years.

**F.    Contrary to ETI's contentions, the Commission's decision was based on a vast evidentiary record, not "solely upon its interpretation of the CGS statute"**

ETI argues that "the Commission did not reach the issue of how much of ETI's costs will be unrecovered as a result of implementing the CGS program, because the Commission defined the term "unrecovered costs" in a way that precludes the issue from arising.  This is simply incorrect.  It is true that the Commission concluded as a matter of law that PURA § 39.452(b)'s reference to "costs unrecovered" does not encompass ETI's recovery theory because, regardless of whether ETI called them "lost base rate revenues" or "embedded production costs," ETI was seeking to charge for lost revenues, not costs.  However, the Commission also embarked on a factual inquiry into what costs actually would be unrecovered.  Indeed, before the Commission issued its order regarding ETI's unrecovered costs in Docket 38951, it considered extensive supplemental testimony on the revised CGS framework, including testimony regarding the definition, existence, and calculation of any costs that would be unrecovered as a

---

[133] *High Plains Natural Gas*, 628 S.W.2d 753, 753 (construing Tex. Rev. Civ. Stat. Ann. art. 1446c).

35

result of the new proposal. The Commission then held an additional evidentiary hearing on the revised program and the issue of unrecovered costs. The commissioners even took the unusual step of conducting this hearing personally rather than referring the case to SOAH.

Having considered the evidence on the new CGS proposal, the Commission made detailed findings on its mechanics.[134] As discussed above, the Commission also made detailed findings on ETI's resource position and its projected future capacity shortfall.[135] These latter findings in particular would be completely superfluous if the Commission's order was based purely on statutory construction. Based on all of its subsidiary findings, the Commission made its ultimate finding (Finding of Fact 51) that "the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff."[136]

Unable to contest this finding on the evidence, ETI resorts to distraction. Specifically, ETI plucks words like "defined," and "interpretation" out of context in an attempt to show that the Commission's decision was based on the statute

---

[134] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 32.
[135] *Id.* at 42-43.
[136] AR Binder 2, Docket No. 38951, Item 119, Final Order at FoF 51.

alone.[137]  Notably, in making this argument, ETI quotes several passages from the Commission's order, but is careful not to quote the operative finding, Finding of Fact 51.  Further, the passages relied upon by ETI do not prove its point.  For example, ETI cites a passage in which the Commission used the word "interpretation."  However, the cited sentence is explicit that the Commission's decision was "Based on the evidence and testimony."[138]  How this sentence could possibly indicate that the Commission based its decision purely on statutory construction is a mystery.

ETI's contention that the Commission defined unrecovered costs in a manner that would categorically exclude the recovery of its production costs is also belied by the order.  The Commission never stated that ETI's only costs eligible for *consideration* under the statute are CGS implementation and administration costs.  It determined that these were the only costs that actually would be unrecovered.  Indeed, there is no dispute that ETI will incur production costs to provide back-up power to a CGS customer.  However, the parties stipulated that the CGS customer would pay for that power under the program, which stipulation the Commission expressly noted in its finding of facts.[139]  If there were no provision for ETI recovering its back-up power production costs, the Commission would have

---

[137] ETI Appellant's Brief at 29.

[138] AR Binder 2, Docket No. 38951, Item 119, Final Order at 8.

[139] *Id*. at FoF 41E&F.

properly found that they were unrecovered costs under the statute. But this was simply not the case with the program the Commission evaluated.

Agency orders are construed as a whole to ascertain the intent of the administrative body.[140] As the Texas Supreme Court has put it, "[t]here is no precise form for an agency's articulation of underlying facts, and courts will not subject an agency's order to some "hypertechnical standard of review."[141] In this case, the order makes clear that the Commission made a factual finding as to what actual costs would be unrecovered. That finding is supported by substantial evidence and should be upheld.

## II. The Commission properly rejected ETI's request to surcharge legal and regulatory costs incurred from 2010 to 2013 as costs of implementation.

ETI's argument in its second issue is that the Commission is required to adopt a special rider for costs related to the CGS program that were incurred prior to any determination that there would even be a CGS program. ETI's argument fails for two principal reasons.

First, the costs of which ETI complains would have been incurred whether or not a CGS tariff was implemented. Had the Commission decided to reject a

---

[140] *Office of Pub. Util. Counsel v. Texas-New Mexico Power Co.*, 344 S.W.3d 446, 450-51 (Tex. App.—Austin 2011, pet. denied) (citations omitted).
[141] *State Banking Bd. v. Allied Bank Marble Falls*, 748 S.W.2d 447, 449 (Tex. 1988).

CGS tariff, as many parties repeatedly invited it to do,[142] there would have been no *implementation* of a CGS tariff whatsoever, and accordingly, there could have been no costs unrecovered as a result of the *implementation* of the tariff.[143] Any costs incurred in the regulatory process leading up to a decision of whether to implement a tariff are subject to the Commission's standard ratemaking procedures.

Costs prior to the Commission's decision to implement a tariff were not caused by the "implementation of the tariff," they were caused by the statutory mandate to delay competition and for ETI to *propose* a competitive generation tariff, which the Commission was authorized to implement or not. They are among the many regulatory costs that utilities incur to comply with statutory mandates, and they would have been incurred whether or not a CGS tariff was actually implemented by the Commission. The Commission's decision that costs incurred before any decision to implement a CGS tariff cannot be deemed to be "as a result of the implementation of the tariff" within the meaning of PURA § 39.45(b) was correct.

Second, the record before the Commission showed that ETI had actually sought and was recovering pre-implementation costs related to the CGS program

---

[142] Supp. AR, Docket No. 37744, State Ex. 2, Pevoto Direct at 38; Supp. AR, Docket No. 37744, Cities Ex. 6, Nalepa Direct at 60; AR Binder 4, Docket No. 38951, Kroger Ex. 2, Townsend Direct at 7.

[143] PURA § 39.452(b) (emphasis added).

through its base rates. At the time of the final hearing in Docket 38951, ETI had already been allowed to include $310,746 per year in CGS-related costs in its base rates.[144] The record in this case does not reflect how long those base rates have been in effect, how much ETI has recovered in CGS-related regulatory costs through those base rates, or how much of CGS-related costs continue to be included in base rates. Accordingly, there is no evidence in the record to indicate whether ETI has over-collected or under-collected its actual pre-implementation CGS-related costs.

In any case, there is no basis for requiring the Commission to ensure that the previously approved base rates recovered exactly the amount of ETI's pre-implementation CGS costs. It is fundamental to ratemaking that the level of the utility's actual costs are constantly changing. Indeed, before the ink is dry on a final order, a utility will be experiencing higher costs in some categories and lower costs in other categories. Nothing in PURA requires the PUC to allow ETI to take one shot at recovering pre-implementation CGS costs through base rates and another shot through a special CGS rider.

---

[144] AR Binder 3, Docket No. 38951, ETI Ex. 103, Roach Supp. Rebuttal at 3 n.2 (recognizing that ETI's current retail base rates include $299,372 in costs related to the CGS program for Total Retail, $11,374 for Wholesale, for a Total Company amount of $ 310,746).

ETI's reliance on *CenterPoint Energy Houston Electric, LLC v. Public Utility Commission* ("*CenterPoint 2013*")[145] is also misplaced.  In *CenterPoint 2013*, the Third Court of Appeals held that the Commission misapplied an energy efficiency rule by excluding from the calculation of a utility's performance bonus a portion of the money that the utility had spent administering energy efficiency programs.[146]  The Commission did not award CenterPoint the full amount of the performance bonus it had sought, arguing that because a portion of the money spent on the programs had been spent under a settlement agreement, and not specifically pursuant to the Commission's rule, that portion was not considered eligible for the bonus program outlined in the rule.[147]  Importantly, it was undisputed that the utility had administered various energy efficiency programs for which it had actually incurred costs.[148]  The appellate court held that because CenterPoint had spent money on energy efficiency programs that surpassed their goal of consumption reduction, the costs that CenterPoint had actually incurred should be considered when calculating the utility's bonus.[149]

*CenterPoint 2013* is inapposite because, unlike ETI, CenterPoint did not seek to recover the money it spent prior to implementing the energy efficiency

---

[145] 408 S.W.3d 910 (Tex. App.—Austin 2013, pet. denied).

[146] *CenterPoint 2013*, 408 S.W.3d at 922.

[147] *Id*. at 917.

[148] *Id.* at 918.

[149] *Id.* at 921.

programs. Rather, the utility sought to include the costs that it had actually incurred to administer its energy efficiency programs in the calculation of its performance bonus. These costs related to the actual *administration* of energy efficiency programs, whereas the costs that ETI seeks to recover here do not relate to administration of a CGS program, but rather to regulatory proceedings that were required whether or not a CGS program would be implemented. The Commission's decision to deny a surcharge for ETI's pre-implementation costs should be affirmed.

## III. The Commission properly rejected ETI's request for interest on CGSC rider costs.

ETI can point to no statutory requirement that the Commission allow interest on the costs of CGS implementation, and utilities are not typically entitled to interest on expenses. The Commission's decision should be upheld.

### A. When the legislature intends to award carrying costs, it says so.

ETI argues that it is entitled to recover its interest on implementation costs because it believes PURA § 39.452(b) gives it a right to recover "all costs" associated with the program, including interest.[150] ETI overstates what it claims to be its CGS *entitlement*.[151] Notably, where PURA has mandated carrying costs, it has specifically stated. There are provisions that expressly provide for recovery of

---

[150] ETI's Appellant's Brief at 34.

[151] *See id.* at 36 ("ETI is statutorily entitled to recover . . . interest.").

42

carrying costs in PURA, but PURA § 39.452(b) is not one of them. For example, PURA § 36.402(b) provides that system restoration costs for a hurricane "shall include carrying costs at the utility's weighted average cost of capital." PURA § 39.4525(d), which authorizes special hiring assistance for federal proceedings, provides: "the commission shall allow the electric utility to recover both the total costs the electric utility paid under Subsection (c) and the carrying charges for those costs through a rider established annually to recover the costs paid and carrying charges incurred during the preceding calendar year." PURA § 39.454, which authorizes recovery for ETI's transition to competition charges, provides that "[a] rate rider implemented to recover approved transition to competition costs shall provide for recovery of those costs over a period not to exceed 15 years, with appropriate carrying costs." PURA § 39.459, which relates to hurricane reconstruction costs, provides: "[i]f the commission determines it to be appropriate, hurricane reconstruction costs may include carrying costs from the date on which the hurricane reconstruction costs were incurred until the date that transition bonds are issued." PURA § 36.061, which authorizes bill payment assistance costs for military veterans, provides that the electric utility is entitled to "apply carrying charges at the utility's weighted average cost of capital to the extent related to the bill payment assistance program." The legislature knows how

to specify the recovery of interest on program costs, and it chose not to do so with the CGS program.

These provisions in PURA indicate that the legislature did not intend for the recovery of carrying costs on CGS costs; otherwise, the CGS statute would include an explicit provision allowing it. A cardinal principle of statutory construction is that if items are listed specifically, items not mentioned are excluded, unless otherwise stated.[152] Similarly, if a term such as "carrying costs" is specified in one section of a statute (PURA §§ 36.402(b), 36.061(c)(3), 39.4525(d), 39.454, and 39.459(b)), but omitted in another section, it is presumed that the legislature did not intend to include it in the latter section.[153] Applying these principles of statutory construction, it is clear that the legislature did not require interest on CGS costs.

**B.    The Commission has not allowed interest to be recovered on similar expenses.**

In reaching its determination that there was no need for interest on CGSC rider costs, the Commission analogized these costs to rate case expenses. The Commission does not allow interest to accrue on the unamortized balance of rate

---

[152] *Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995).

[153] *Id*. ("When the Legislature employs a term in one section of a statute and excludes it in another section, the term should not be implied where excluded.").

case expenses.[154] The Commission has a precedent of disallowing the recovery of interest in such instances.[155] For example, in Docket 30706, CenterPoint Energy sought to recover its rate case expenses over three years with a return on the unpaid balance. The Commission rejected CenterPoint's request for interest, explicitly noting its "practice of not permitting utilities to receive interest on unpaid rate-case expenses."[156]

Not allowing interest on CGS implementation costs is consistent with the treatment of rate case expenses, which are typically amortized over a three-year period without a return on the unamortized balance.[157] ETI cites no Commission precedent allowing a return on the unamortized amount of rate-case expenses. There is ample and longstanding Commission precedent, however, that denies the

---

[154] AR Binder 2, Docket No. 38951, Item 119, Final Order at 10. Utilities and municipalities are reimbursed for legal expenses incurred during rate cases. PURA §§ 36.061(b)(2), 33.023.

[155] *Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule 25.344*, Docket 22355, Order at FoF 98G (Oct. 4, 2001) ("The Commission finds that Reliant should not earn a return on the outstanding balance of its rate case expenses."). *See also Petition of Texas Electric Service Co. for Authority to Change Rates,* Docket 2606, 5 P.U.C. BULL. 109 (Oct. 16, 1979) (finding that in amortizing legal expenses arising from previous Commission investigation and prior rate case, Commission refused to include requested carrying charge in utility's cost of service as an allowance for the time value of money); Complaint of the City of McKinney Against Southwestern Bell Telephone Company, Docket 11027, Final Order at CoL 9 (May 17, 1995) (noting that nothing "in PURA authorizes McKinney to recover interest on its rate case expenses.").

[156] *Application of CenterPoint Energy Houston Electric, LLC for a Competition Transition Charge*, Docket 30706, Order at 32 (Jul. 14, 2005).

[157] AR Binder 4, Docket No. 38951, TIEC Ex. 27, Pollock Second Supp. Direct at 27.

recovery of interest on these types of costs.[158]  Further, this Court has affirmed the Railroad Commission's refusal under PURA to allow a utility to recover interest on its rate-case expenses.[159]

Lastly, ETI mistakenly relies on *CenterPoint Energy, Inc. v. Public Utility Commission* ("*CenterPoint 2004*").[160]  That case dealt with the unique situation of the calculation of stranded costs for utilities that were subject to deregulation.  ETI continues to be subject to traditional cost-of-service regulation.  Nothing in *CenterPoint 2004* suggests that the Commission's longstanding practice of not allowing interest on expenses is unlawful.

Contrary to ETI's assertion, utilities have no general right to charge interest on expenses. The Commission's denial of interest is consistent with PURA and should be upheld.

## PRAYER

For all the foregoing reasons, TIEC prays that the Court affirm the district court's judgment in all respects and grant TIEC all other such relief to which it may show itself justly entitled.

---

[158] *Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule 25.344*, Docket 22355, Order at 61 n.130 (Oct. 4, 2001).

[159] *Moran Util. Co. v. R.R. Comm'n,* 697 S.W.2d 447, 452 (Tex. App.—Austin 1985, pet. granted) (aff'd in relevant part, rev'd in part, 728 S.W.2d 764 (Tex. 1987)).

[160] ETI Appellant's Brief at 35-36 (citing *CenterPoint Energy, Inc. v. Pub. Util. Comm'n*, 143 S.W.3d 81, 83 (Tex. 2004)).

Respectfully submitted,

*/s/ Rex D. VanMiddlesworth*
Rex D. VanMiddlesworth
State Bar No. 20449400
Benjamin Hallmark
State Bar No. 24069865
**THOMPSON & KNIGHT LLP**
98 San Jacinto Blvd., Suite 1900
Austin, TX  78701
Telephone:  (512) 469-6100
Facsimile:   (512) 469-6180

**ATTORNEYS FOR APPELLEE TEXAS
INDUSTRIAL ENERGY CONSUMERS**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 11,437 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), including the Glossary of Abbreviations, as measured by the undersigned's word-processing software.

*/s/ Benjamin Hallmark*

**CERTIFICATE OF SERVICE**

As required by Texas Rule of Appellate Procedure 9.5, I certify that on the 13th day of February, 2015, the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties listed below via electronic service:

| | |
|---|---|
| *Counsel for Entergy Texas, Inc.* | David C. Duggins<br>John F. Williams<br>Marnie A. McCormick<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900<br>Austin, Texas 78701 |
| *Counsel for the Public Utility Commission of Texas* | Elizabeth R. B. Sterling<br>Megan M. Neal<br>Environmental Protection Division<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, Texas 78711-2548 |
| *Counsel for Office of Public Utility Counsel* | Sara J. Ferris<br>Office of Public Utility Counsel<br>1701 N. Congress Ave., Ste. 9-180<br>P.O. Box 12397<br>Austin, Texas 78711-2397 |

*/s/ Benjamin Hallmark*

**APPENDIX**

D. 38951 – Excerpt from Supplemental Direct Testimony
and Exhibits of Jeffry Pollock

## PUC DOCKET NO. 38951

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, INC. FOR APPROVAL OF COMPETITIVE GENERATION SERVICE TARIFF (ISSUES SEVERED FROM DOCKET NO. 37744) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | PUBLIC UTILITY<br><br>COMMISSION OF TEXAS |

Supplemental Direct Testimony and Exhibits

of

### JEFFRY POLLOCK

On Behalf of

### Texas Industrial Energy Consumers

12 FEB 10 PM 2:41 RECEIVED ... Y COMMISSION FILING CLERK

**February, 2012**



## J . POLLOCK

INCORPORATED

52

## 3. UNRECOVERED COSTS FROM THE CGS PROGRAM

Q    WHY IS THE ISSUE OF THE DEFINITION OF "UNRECOVERED COSTS" BEING ADDRESSED IN THIS PROCEEDING?

A    PURA § 39.452(b) provides that ETI's rates "shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff." ETI and TIEC do not agree about what "costs" this refers to. Just as ETI and other utilities unsuccessfully argued with respect to energy efficiency program costs, ETI claims the reference to "costs" would allow it to recover not just its actual expenditures in implementing a CGS Program but also hypothetical lost revenues ETI may have received if all CGS Customers paid ETI's full firm rate instead. ETI's proposed Rider CGSUSC clearly states that it "defines the procedure by which Entergy Texas, Inc. ('Company') shall implement and adjust rates for recovery of **lost base rate revenue** resulting from customers participating in the Company's Competitive Generation Service ('CGS Program')."[1] (emphasis added)

### Definition of Unrecovered Costs

Q    HOW SHOULD UNRECOVERED COSTS BE DEFINED?

A    Unrecovered costs should not include ETI's hypothetical lost revenues. If a CGS tariff is adopted, the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and

---

[1] Docket No. 37744, ETI Ex. 9 at Exhibit PRM-1.



**J.POLLOCK**
INCORPORATED

15

maintain a CGS Program, as well as the cost of providing backup power to CGS Customers. All of those costs should be fully paid by the CGS Customers.

Q **WHAT EXPENDITURES WOULD ETI INCUR TO IMPLEMENT AND MAINTAIN THE CGS PROGRAM ONCE THE PROGRAM IS ADOPTED?**

A ETI witness, Mr. Phillip R. May, has stated that ETI will incur both start-up and on-going costs associated with the CGS Program. This will include costs related to incremental implementation and ongoing operating costs incurred to support the CGS Program.[2] According to Mr. May:

> ETI must modify its Customer Information System ("CIS") and Large Power Billing Systems ("LPBS") within its Major Account Billing function to support the CGS Program as it is currently designed.

> In addition to the initial implementation costs explained above, the CGSC Rider will also recover incremental on-going costs incurred to support the CGS Program. These incremental costs are primarily focused around the Major Accounts Billing and its systems support.[3]

Q **HOW SHOULD THESE COSTS BE RECOVERED?**

A As I discussed in my testimony in Docket No. 37744, these costs should be recovered from CGS Customers based on a fixed monthly charge. ETI's program development and ongoing costs will depend on the scope of the program that is ultimately approved.

Q **WHAT COSTS WILL ETI INCUR TO PROVIDE BACKUP POWER?**

A ETI will provide generation services when a CGS Supplier cannot provide the CGS Contract Capacity in any given hour (provided that the CGS Customer has not

---

[2] Docket No. 37744, *Direct Testimony of Phillip R. May* at 14.

[3] *Id* at 19.

3. Unrecovered Costs From the CGS Program



simultaneously curtailed its CGS load). Thus, ETI will incur additional fuel and other variable costs as well capacity costs to stand ready to provide backup service.

Q   HOW WILL THE COSTS OF BACKUP POWER BE RECOVERED?

A   The costs of backup power will be paid for by CGS Customers through the Unserved Energy Rate and a Fixed Cost Contribution Fee referenced in the Stipulation. Unserved Energy will be priced at 105% of avoided energy cost plus an O&M Adder. This is similar to how ETI currently prices backup power in Schedule SMS.[4] In addition, the CGS Customer will be required to pay a Fixed Cost Contribution Fee of $1.10 per kW-Month of CGS Contract Capacity. The Unserved Energy pricing mechanism ensures that CGS Customers pay all of the incremental variable costs associated with back-up power plus a contribution to generation fixed costs.

Q   WOULD ANY UNRECOVERED COSTS EXIST AFTER START-UP, ON-GOING AND BACKUP POWER COSTS ARE PAID BY THE CGS CUSTOMER?

A   No. Recall that, under the CGS Program described in the Stipulation, the CGS Customer would effectively buy its own capacity and energy from the CGS Supplier. With the exception of the capacity credit and fixed fuel factor, a CGS Customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer, including a transmission and distribution rate and all other applicable tariffs (e.g., Rider TTC, HRC, SRC, SCO, AFC and FF charges, if applicable). There would be no other unrecovered costs.

---

[4] The same O&M Adder is also used in Schedule SMS. In addition, Schedule SMS customers pay for energy at 100% of avoided cost rather than 105%.

**3. Unrecovered Costs From the CGS Program**



J.POLLOCK
INCORPORATED

17

## Hypothetical Lost Revenues Are Not Unrecovered Costs

Q    WHAT IS ETI'S DEFINITION OF UNRECOVERED COSTS?

A    In addition to start-up, on-going, and backup power costs, ETI defines its unrecovered costs as lost base rate revenue from CGS Customers. As described in its proposed Rider CGSUSC tariff in Docket No. 37744, the purpose of its Rider CGSUSC is as follows:

> This Competitive Generation Service Unrecovered Service Cost Rider ("Rider CGSUSC" or "Rider") defines the procedure by which Entergy Texas, Inc. ("Company") shall implement and adjust rates for **recovery of lost base rate revenue** resulting from customers participating in the Company's Competitive Generation Service ("CGS Program"). The purpose of this Rider is to provide a mechanism for **recovery of such lost base rate revenues** that were included in the Company's last general rate case proceeding before the Public Utility Commission of Texas ("PUCT"). (emphasis added)[5]

Thus, ETI asserts that lost revenues and unrecovered costs are the same.

Q    HOW DOES ETI CALCULATE UNRECOVERED COSTS FROM LOST BASE RATE REVENUES?

A    ETI is proposing to calculate unrecovered costs based on the revenues associated with the generation cost components reflected in the ETI firm rate that would otherwise apply to the CGS Customer. Lost revenues are the product of generation-related charges (*e.g.*, $6.84 per kW-Month for the current LIPS rate based on the rates established in Docket No. 37744) and the amount of CGS load, less certain offsets.

---

[5] Docket No. 37744, ETI Ex. 9 at Exhibit PRM-1.

3. Unrecovered Costs From the CGS Program



Q  WHAT ARE THOSE OFFSETS?

A  ETI proposes to reduce lost revenues to reflect the following off-setting revenue contributions/cost reductions:

1.  The Fixed Cost Contribution Fee of $1.10 per kW-Month;
2.  Revenues from the Variable O&M Adder when Unserved Energy is provided; and
3.  A reduction in Schedule MSS-1 payments to the other Entergy operating companies as a result of treating CGS as firm capacity, which ETI calculates as $3.10 per kW-Month.

These offsets are shown in ETI's Exhibit PRM-4. ETI calculates net unrecovered costs at current rates of $2.64 kW-Month, less whatever offset would result from the O&M Adder.

Q  ARE LOST REVENUES AND COSTS THE SAME THING?

A  No. Costs are ETI's actual expenditures to serve a CGS Customer, not its anticipated revenues from hypothetical lost sales to customers.

Q  ARE YOU FAMILIAR WITH ANY COMMISSION PRECEDENT REGARDING THE ISSUE OF WHETHER A UTILITY'S COSTS MAY INCLUDE LOST REVENUES?

A  Yes. I am aware that the Commission in Project No. 37623 and Docket No. 38213 rejected a lost revenues approach to determining costs associated with energy efficiency programs and that the Commission's decision has been upheld by the courts, most recently in a 2011 Court of Appeals decision.

---

**3. Unrecovered Costs From the CGS Program**



J.POLLOCK
INCORPORATED

Q   DID THE COURT OF APPEALS DISCUSS THE DISTINCTION BETWEEN "COSTS" AND "LOST REVENUES"?

A   Yes. The court specifically found that the term "costs" in PURA is not intended to include lost revenues, stating as follows:

> In at least two other provisions of PURA, the legislature expressly distinguishes "costs" from "revenues," indicating that its use of the term "costs" by itself does not encompass lost revenues. For example, PURA section 55.042(b) provides that a telecommunications utility may recover "all costs incurred *and all loss of revenue*" resulting from imposition of charges for providing mandatory two-way extended area service to customers. *See* Tex. Util. Code Ann. § 55.042(b) (West 2007) (emphasis added). In PURA section 56.025(e), the legislature directed the Commission to "implement a mechanism to replace the reasonably projected increase in costs *or decrease in revenue*" caused by a governmental agency's order, rule, or policy. *See id.* § 56.025(e) (West 2007) (emphasis added). **These provisions further support our conclusion that the term "costs," as used by the legislature in PURA, is not intended to include lost revenues.** The legislature's failure in PURA section 39.905 to specifically provide for recovery of "lost revenues," in addition to "costs," indicates that it intended for EECRF to serve as a mechanism for a utility to recovery out-of-pocket expenditures associated with its implementation of energy-efficiency programs, not to compensate a utility for any associated lost revenues attributable to those programs. [6] (emphasis added)

Q   ARE THERE ANY POLICY REASONS TO ALLOW ETI TO RECOVER LOST REVENUES THAT IT ATTRIBUTES TO THE CGS PROGRAM?

A   No. As previously discussed, the CGS Program would allow a retail customer to replace ETI generation service with electricity provided from a QF in ETI's service area. This is no different than a customer that chooses to install generation or energy efficiency to displace the service that would otherwise be provided by ETI.

---

[6] *CenterPoint Energy Houston Elec., LLC v. Public Utility Com'n*, 354 S.W.3d 899 (Tex.App.–Austin, 2011).

---

3. Unrecovered Costs From the CGS Program



J.POLLOCK
INCORPORATED

Q      IS ETI ALLOWED TO RECOVER LOST REVENUES FROM A CUSTOMER THAT INSTALLS EITHER SELF-GENERATION OR ENERGY EFFICIENCY?

A      No.  Given that there is no difference between CGS, installing self-generation, and energy-efficiency in terms of its impact on the regulated utility, it would not be good public policy to treat the CGS Program differently from either self-generation or energy efficiency.  The utility should not be allowed to recover more than the actual costs of providing the service associated with a particular program.

Q      ARE THERE OTHER POLICY REASONS TO REJECT ETI'S LOST REVENUE APPROACH?

A      Yes.  ETI's lost revenue approach assumes that it would have provided generation services to all loads that opt to participate in the CGS Program.[7]  This is not a valid assumption.  For example:

- An existing self-generation customer could choose to replace its existing generation with CGS power because CGS power is more economical than generation services purchased from ETI;

- A customer could restart an idled facility because the CGS Program makes the restart economically viable;

- An existing ETI customer could decide to add facilities, or;

- A new customer could locate in ETI's service area because electricity is less expensive under the CGS Program than under ETI's other tariffs.

In each of these scenarios, the customer would not have purchased generation services from ETI under a firm rate.  ETI clearly cannot claim that it lost any revenues as a result of the CGS Program in these instances.  In fact, ETI would

---

[7] ETI's Response to TIEC 1-9.

3. Unrecovered Costs From the CGS Program



J.POLLOCK
INCORPORATED

enjoy higher revenues. Yet, all of these scenarios would be counted in ETI's definition of lost revenues.

## There are No Lost Revenues

Q IF THE COMMISSION ADOPTS ETI'S LOST REVENUES APPROACH TO CALCULATING COSTS, WOULD ETI EXPERIENCE ANY UNRECOVERED COSTS AS A RESULT OF THE IMPLEMENTATION OF THE PROGRAM?

A No.

Q PLEASE EXPLAIN.

A ETI's lost revenues approach is flawed because it has failed to recognize the impact of its increased revenues from load growth. With the proposed cap, the CGS Program would at most have the effect of slowing ETI's load growth, not reducing its load. As load grows, each additional kW and kWh sold will provide a contribution to all fixed costs, including embedded generation capacity costs. Any reduction in embedded generation cost recovery that may be attributable to the CGS Program may be more than offset by the increased revenues resulting from load growth. Stated differently, as long as ETI continues to collect the same amount of revenue or more as its embedded generation costs established for a test-year, it cannot claim that any costs are unrecovered, irrespective of how it defines unrecovered costs. Instead, those costs are simply being recovered from new customers or through growth in the demand of existing customers.

---

3. Unrecovered Costs From the CGS Program



Q CAN YOU PLEASE PROVIDE AN EXAMPLE OF HOW LOAD GROWTH WOULD OFFSET ETI'S LOST REVENUES FROM A CUSTOMER THAT GOES ON THE CGS PROGRAM?

A Yes. Assume a hypothetical utility's base rates are set based on test year sales of 1,000 MW. Then assume in a subsequent year the utility has 1,000 MW of firm load plus 100 MW of load associated with a CGS Customer that provides its own generation. In this simplified example, the utility has clearly experienced no unrecovered capacity costs associated with the 100 MW CGS Customer. It is still responsible for providing capacity for 1000 MW of firm load, and it receives revenues from 1,000 MW of firm load.

Q IS ETI CONTINUING TO EXPERIENCE LOAD GROWTH?

A Yes. **Exhibit JP-2** quantifies the growth in sales experienced by ETI since its last rate case. As can be seen, ETI is serving 10,515 (2.6%) more customers, selling 887 million (5.9%) more kWh, and the billing demand for the demand metered classes has increased by 1.7 million kW (7.2%) since the last rate case.

Q IS ETI PROJECTING LOAD GROWTH OVER ITS PLANNING HORIZON?

A Yes. **Exhibit JP-3** is an excerpt from Entergy's Strategic Resource Plan (SRP) Refresh. It shows the projected long-term load growth for each operating company, including ETI. As can be seen, ETI is projecting load growth through the year 2029. On average, ETI's projected annual growth is about 2%, which translates into about 80 MW per year. Over the next five years, projected load growth will average nearly 74 MW per year.

---

**3. Unrecovered Costs From the CGS Program**



J.POLLOCK
INCORPORATED

Q WOULD THE ADDITIONAL REVENUES DERIVED FROM ETI'S PROJECTED LOAD GROWTH MORE THAN OFFSET ETI'S CLAIMED LOST REVENUES?

A Yes. This is shown in **Exhibit JP-4**. The starting point for the analysis is the lost revenues per kW calculated in ETI's Exhibit PRM-4, line 6. Assuming that the maximum 150 MW of load were to subscribe to CGS service, ETI would calculate annual lost revenues at $4.8 million at current rates (line 2). However, each additional kilowatt of load would generate $6.84 per kW of additional capacity-related revenue (line 3). At this rate, ETI would have to experience only 58 MW of load growth to fully offset the lost revenues (line 4).

Q WOULD THE RESULTS CHANGE MATERIALLY IF THE RATES THAT ETI IS PROPOSING TO IMPLEMENT IN ITS PENDING RATE CASE WERE ADOPTED?

A No. For illustration only, I have also analyzed the impact if the rates proposed in ETI's pending rate case (Docket No. 39896) were adopted. As can be seen, revenues from projected annual load growth would exceed the projected loss of revenues from 150 MW of CGS service.

Q WHAT REASON DID ETI GIVE FOR NOT OFFSETTING ITS LOST REVENUES WITH REVENUES FROM LOAD GROWTH?

A Mr. May asserts that "Load growth is not a concept that can be appropriately applied within the context that rates are set in Texas based upon an historical test year with known and measureable costs."[8] However, Mr. May's assertion is inconsistent with ETI's lost revenue approach, which would make an out-of-test-year adjustment by

---

[8] *Supplemental Testimony of Phillip R. May* at 12.

3. Unrecovered Costs From the CGS Program



quantifying its change in revenues resulting from loads that convert to CGS. Equating lost revenues with unrecovered costs is wrong in the first place, but even if one accepted that hypothetical, ETI's approach fails to recognize offsetting changes, such as load growth.

Q    DO YOU AGREE WITH MR. MAY THAT LOAD GROWTH IS ONLY OFFSETTING INCREMENTAL COSTS?

A    Yes.  However, that is exactly what a load growth offset to lost revenues would accomplish.  As shown by Exhibit PRM-4, ETI is asserting that CGS is creating a net incremental cost of between $2.64 and $3.54 per kW month.  It is, therefore, appropriate to recognize how load growth can offset this incremental cost.

**Other Offsetting Cost Savings**

Q    ARE THERE ANY OTHER OFFSETTING COST SAVINGS FROM THE CGS PROGRAM?

A    Yes.  Because a CGS Customer is effectively self-supplying generation that ETI does not have to procure, operate and maintain, ETI can utilize existing generation resources to serve both existing and new non-CGS loads.  This, in turn, would allow ETI to defer or displace additional generation capacity that would be needed to maintain reliable service.  As discussed later, ETI is short of capacity; specifically base-load capacity.  The CGS Program can provide the needed base-load capacity at a lower cost than the alternatives.

3. Unrecovered Costs From the CGS Program



Q   DOES ETI'S LOST REVENUE APPROACH RECOGNIZE HOW THE CGS PROGRAM COULD POTENTIALLY OFFSET THE NEED FOR NEW BASE-LOAD CAPACITY AND PRODUCE OPERATING SAVINGS?

A   No, it does not. ETI has a significant supply deficit. This is shown in **Exhibit JP-5**, which is an excerpt from Entergy's 2009 Strategic Resource Plan (SRP). The supply deficit is shown for each different capacity supply role; that is, Base Load, Core Load Following, Seasonal Load Following, and Peaking Plus Reserves. As can be seen, ETI's total deficit is about 978 MW. However, its total deficit of base-load supply is 969 MW. Thus, ETI's supply deficit is almost entirely base-load capacity. If CGS can be counted as firm capacity, it can reduce ETI's base-load capacity deficit.

Q   WHAT CONDITIONS MUST CGS SUPPLY MEET IN ORDER TO BE COUNTED AS FIRM CAPACITY?

A   At a minimum, a CGS Supplier must enter into a contract with ETI to provide CGS capacity on a 24x7 basis, except when the supplier's resource is not physically available. Further, the CGS Supplier must obtain the status of a network resource under Entergy's OATT. And finally, the CGS Supplier must make the necessary arrangements to ensure that there is adequate transmission to support any CGS contract for the duration of the proposed contract.[9] Assuming all of these minimum conditions are met, there is no legitimate reason for not treating the CGS Supply as firm capacity.

---

[9] I have observed that several of ETI's Purchased Power Agreements obligate ETI (and not the seller) to obtain network transmission service.

**3. Unrecovered Costs From the CGS Program**



Q   WHY DO YOU ASSERT THAT CGS SUPPLY IS A MORE ECONOMICAL RESOURCE THAN BASE-LOAD CAPACITY THAT ETI WOULD OTHERWISE NEED IN THE ABSENCE OF CGS?

A   The SRP identifies a combined cycle gas turbine (CCGT) as the best option for meeting the Entergy system's base-load capacity deficit.[10] The estimated installed cost and levelized fixed cost of new CCGT capacity is provided in **Exhibit JP-6**.

The information was obtained from a variety of different sources, including the Entergy SRP, Ninemile Unit 6 (a capacity addition planned by Entergy Louisiana, LLC), and the Energy Information Administration (EIA). As can be seen, the installed costs range from $1,235 to $1,280 per kW. Using the same levelized fixed charge rate that Entergy uses in evaluating self-build generation options, the range of levelized annual fixed cost would be $168 to $177 per kW-Year ($13.99 to $14.74 per kW-Month). The embedded generation capacity cost reflected in current rates is $82 per kW-Year ($6.84 per kW-Month). Thus, adding self-build base-load capacity will drive rates up for all ETI customers.

Q   HAS THE COMMISSION EMPLOYED A SIMILAR GENERATION PROXY IN DETERMINING THE COST EFFECTIVENESS OF ENERGY EFFICIENCY PROGRAMS?

A   Yes. In Subst. R. 25.183(b)(2) the Commission has established a capacity benefit of energy efficiency programs of $80 per kW-Year or $6.66 per kW-Month. Although this proxy is based on the cost of typically lower-cost peaking capacity (and is

---

[10] Entergy System Planning & Operations, *2009 Strategic Resource Plan* at 1-10.

**3. Unrecovered Costs From the CGS Program**



therefore not directly comparable to CGS Supply, which is base-load capacity), it is clearly comparable to the generation capacity charges included currently in base rates that ETI uses as the starting point for its lost revenue calculations.

Q **YOU PREVIOUSLY MENTIONED THAT ETI TREATS THE LOWER PAYMENTS UNDER SCHEDULE MSS-1 AS AN OFFSET TO LOST REVENUES. WHAT IS SCHEDULE MSS-1?**

A Schedule MSS-1 is a FERC approved tariff that "equalizes" reserve capacity throughout the Entergy system. Each operating company is required to have sufficient capacity to meet its firm load obligation. An operating company that does not have sufficient capacity to meet its firm load obligation is said to have a "deficit," while an operating company with more capacity than is needed to meet its firm load obligation is said to have a "surplus." Under Schedule MSS-1, the deficit companies make a reserve equalization payment to the surplus companies. The reserve equalization payment is based on the embedded cost of the older steam units on the Entergy System that are designated as reserve capacity. The sum of the payments by the deficit companies equals the sum of the receipts by the surplus companies. Thus, Schedule MSS-1 is a transfer payment between the Entergy operating companies.

Q **DOES ENTERGY TEXAS HAVE A SURPLUS OR A DEFICIT OF RESERVE CAPACITY?**

A ETI is a deficit company. Thus, it makes reserve equalization payments to the surplus operating companies.

---

3. Unrecovered Costs From the CGS Program



Q HOW WOULD THE CGS PROGRAM AFFECT THE AMOUNT OF RESERVE EQUALIZATION PAYMENTS THAT ETI MAKES UNDER SCHEDULE MSS-1?

A If the CGS Suppliers are counted as firm resources, it will decrease ETI's reserve capacity deficit, which in turn will reduce the amount of reserve equalization payments. For this reason, ETI recognizes this reduction as an offset to lost revenues.

Q DOES THAT MAKE SCHEDULE MSS-1 A PROXY FOR THE VALUE OF CGS CAPACITY?

A No. As previously stated, the Schedule MSS-1 charges are a transfer payment between the Entergy operating companies for *existing* generation capacity resources. CGS, by contrast, would be a *new* system resource. Further, CGS would be a 24x7 base-load resource, while Schedule MSS-1 is based on the cost of existing reserve capacity, which is comprised of peaking resources that are used infrequently. Thus, it would be incorrect to use the Schedule MSS-1 rate (which reflects the cost of *existing peaking* capacity resources) to value CGS Power (which is an *incremental base-load* resource).

Further, Entergy does not take its MSS-1 costs into account for resource planning purposes. That is, when planning to meet ETI's resource needs through either a purchase power agreement (PPA) or other resource, MSS-1 costs are not considered.[11]

---

[11] Docket No. 37744, *Deposition of Robert Cooper* at 24-25.

3. Unrecovered Costs From the CGS Program



Q IF SCHEDULE MSS-1 IS A PROXY FOR THE INCREMENTAL COST OF CAPACITY, WOULD IT EVER MAKE ECONOMIC SENSE FOR ETI TO ENTER INTO PURCHASED POWER AGREEMENTS THAT WERE MORE EXPENSIVE THAN THE MSS-1 RATE?

A No, because this presumes ETI's incremental cost of capacity is the MSS-1 rate. In fact, ETI is paying higher demand charges (substantially higher in some PPAs) than $3.73 per kW-Month, which is the current Schedule MSS-1 rate as shown in Exhibit PRM-3. If the value of capacity was only $3.73 per kW, it is unlikely that these PPAs would be considered prudent.

Q PLEASE SUMMARIZE YOUR ANALYSIS OF THE COST OF CGS SUPPLY RELATIVE TO THE ALTERNATIVES.

A ETI's lost revenues approach assumes that the cost of CGS Supply would be equal to ETI's embedded generation capacity costs or $82 per kW-Year ($6.84 per kW-Month x 12). Put another way, it is ETI's position that *even though the parties have agreed that the CGS Customer will pay for its own capacity pursuant to the CGS Customer-Supplier Agreement*, ETI's capacity costs for the CGS Program will be at least equal to $6.84 per kW-Month (before offsets). However, as demonstrated above, the cost of alternative capacity resources that would offset its projected base-load capacity deficit would be $14 or more per kW-Month, which is substantially above ETI's embedded generation capacity costs. Thus, from a capacity perspective, CGS power can be a lower cost option for ETI than the base-load resources ETI would otherwise need to meet its projected capacity.

---

3. Unrecovered Costs From the CGS Program



Q HAVE YOU REVIEWED THE TESTIMONY OF ANDREW J. O'BRIEN ON BEHALF OF ETI?

A Yes. Mr. O'Brien contends (on pages 7-8) that CGS Supply will have little or no capacity value.

Q DO YOU AGREE WITH MR. O'BRIEN'S ANALYSIS?

A No. Mr. O'Brien has clearly undervalued the capacity benefits of CGS power. First, it should be noted that Mr. O'Brien makes this claim with respect to CGS power, but ETI admits that it has done no comparison of the value of CGS power to its existing purchase power contracts.[12] Mr. O'Brien's testimony should be given very little weight for this reason. Second, Mr. O'Brien's analysis ignores the specific supply role that a particular resource (such as CGS) may be selected to provide. As previously stated, Entergy defines four major supply roles:

- Base Load;
- Core Load Following;
- Seasonal Load Following; and
- Peaking Plus Reserves.

It is reasonable to expect that each different type of resource will possess the characteristics required to meet its specific supply role. In other words, a particular resource need not possess *every* attribute identified in Mr. O'Brien's testimony to be of value.

For example, with regard to *flexibility*, Mr. O'Brien asserts that CGS capacity has no flexibility, it cannot be cycled or used to follow load variations or controlled by

---

[12] ETI's Response to TIEC 1-2.

**3. Unrecovered Costs From the CGS Program**



31

the Entergy System Operator.[13] These limitations would be of concern if CGS power was intended to be a load following product. It is not a concern for a base-load product. As such, CGS power is similar to a nuclear plant. A nuclear plant will either be totally on or totally off. As long as a nuclear plant is capable of operating at full output, there would never be a reason for the System Operator to change the dispatch of the plant. Further, it is unclear how Mr. O'Brien accounts for the fact that the Entergy System Operator will be able to order the CGS Supplier to curtail or not operate during system emergencies, the same as other network resources.

Q  WOULD THE UNIT CONTINGENT NATURE OF CGS CAPACITY MAKE IT LESS VALUABLE THAN OTHER ETI RESOURCES?

A  No, not necessarily. Mr. O'Brien asserts that CGS would be less firm than other resources. However, he has provided no analysis to support his assertion. Further, his concern about the "priority" of the host loads behind all QFs (including the QFs that sell unit contingent power to ETI) is misplaced. This is because the failure to achieve the required performance can be costly. The CGS Supplier will not be immune from performance risk.

The 24x7 nature of the CGS product will require the CGS Supplier to commit only the amount of capacity that can meet a high level of performance. Further, as previously stated, the CGS Supplier is obligated to achieve an 80% capacity factor during on-peak hours. Failure to do so would subject the CGS Customer to additional costs and potentially trigger liquidated damage charges.

---

[13] ETI's Response to TIEC 1-1.

3. Unrecovered Costs From the CGS Program



J. POLLOCK
INCORPORATED

Q HAS ENTERGY ENTERED INTO SHORT-TERM UNIT CONTRACTS?

A Yes. ETI has entered into numerous unit contingent contracts, including both affiliates and third party contracts. **Exhibit JP-7** is a list of the currently effective unit contingent contracts and the term of each separate transaction. As can be seen, most of these unit contingent transactions have terms as short as one to three years.

Q DO MR. O'BRIEN'S CONCERNS ABOUT THE MINIMUM SIZE OF A CGS CONTRACT HAVE MERIT?

A No. The CGS Program is essentially being offered as a pilot. Accordingly, limitations have been placed on the scope of the program, including the eligible suppliers and the maximum amount of CGS load. It is unclear that potential customers would want to risk a significant amount of load without first gaining more experience.

However, the initial offering could result in up to 150 MW of firm base-load capacity. This is comparable in size to the majority of ETI's unit contingent contracts, as shown in **Exhibit JP-7**.

If the pilot is a success, there is no reason not to expect customers to commit more of their load to CGS and potentially enter into longer term contracts.

Q DO YOU AGREE WITH MR. O'BRIEN'S RANKING OF CGS RELATIVE TO ENERGY COST?

A No. The moderate ranking is based on the fact that CGS energy is priced at avoided cost. However, Mr. O'Brien ignores that the CGS Customer will be paying ETI avoided cost for every kWh purchased by ETI from the CGS Supplier and resold to

3. Unrecovered Costs From the CGS Program

**J.POLLOCK**
INCORPORATED

33

the customer. Thus, the CGS Program will have a "zero" net energy cost to ETI's customers. Even base-load units have some positive energy cost. For this reason, CGS should be ranked as "highly valuable" with respect to energy cost.

Q    DOES THE LOCATION OF CGS SUPPLY DIMINISH ITS VALUE?

A    No. Ideally, resources should be located close to the loads they serve. The CGS Supply will be located in ETI's service area. This service area is within the WOTAB planning region, which is considered a capacity-constrained region.[14]

Q    DOES ETI PURCHASE CAPACITY THAT IS LOCATED OUTSIDE OF WOTAB?

A    Yes. For example, the resources supporting the EAI-WBL are located outside of WOTAB. This fact has not diminished ETI's willingness to pay a high price for this capacity.

Q    DOES MR. O'BRIEN'S TESTIMONY PLACE A HIGH VALUE ON ANY ASPECT OF CGS SUPPLY?

A    Yes. His testimony ascribes a high value on firming up QF Puts. As discussed below, firming up the QF Puts would reduce the need for flexible capacity and lower operating costs.

---

[14] Entergy System Planning & Operations, *2009 Strategic Resource Plan* at 2-10. The WOTAB planning region is the area generally west of the Baton Rouge, Louisiana metropolitan area, to the westernmost portion of Entergy's service territory in Texas. The westernmost portion of WOTAB is the Western area (a sub-area), which encompasses the westernmost part of ETI's service territory, generally west of the Trinity River.

**3. Unrecovered Costs From the CGS Program**



J.POLLOCK
INCORPORATED

Q      WHAT IS A QF PUT?

A      A QF Put is when a Qualifying Facility generates excess energy that cannot be otherwise used by the QF's host load. This excess energy is "put" to the Entergy system. QF Puts are unscheduled, and they are also highly variable. According to Entergy, in 2008 QF Puts change an average of 182 MW or more during a one hour period and 891 MW in a 24-hour period. Five percent of the time, the QF Put changed by 1,674 MW or more during a 24-hour period.[15]

Q      IS THERE A COST INCURRED BY ENTERGY TO MANAGE QF PUTS?

A      Yes. Entergy says it incurs significant costs to manage QF Puts. For example:

> The amount of energy put to the System by Qualifying Facilities (QFs) varies significantly from minute-to-minute and hour-to-hour. **Changes in the injection or retraction of QF Put energy require the System to have a substantial amount of flexible load following capacity ready and available to the System Dispatcher to increase or decrease System generation so that changes in QF puts can be managed without compromising reliability.**[16] (emphasis added)

Q      HOW MUCH FLEXIBLE CAPACITY DOES ENTERGY SAY IT REQUIRES?

A      According to Entergy:

> The amount of flexible capacity that must be operating in any particular time is typically on the order of 4,000 to 6,000 MWs. At times during the year, the amount of flexible capacity that must be committed can be as much as 9,000 MWs.[17]

---

[15] *Id.* at 7-13.

[16] *Id.*

[17] *Id.* at 8-8.

3.  Unrecovered Costs From the CGS Program



J.POLLOCK
INCORPORATED

35

Q   WOULD CGS FIRM-UP THE QF PUTS?

A   Yes. CGS could eliminate up to 150 MW of QF Puts. By reducing the QF Puts, the system should require less flexible capacity and incur lower operating costs.

Q   HAS THE ENTERGY SYSTEM HAD EXPERIENCE WITH FIRMING-UP QF CAPACITY?

A   Yes. In November 2008 Entergy Gulf States Louisiana, LLC (EGSL) sought approval of a three-year contract with Calpine for the purchase of 485 MW of capacity. The generation facility was part of a QF. In supporting the proposed contract, EGSL cited a number of benefits:

> Q.  DOES THE ECONOMIC ANALYSIS INCLUDE ANY BENEFITS ASSOCIATED WITH FIRMING UP THE QF PUT CURRENTLY ASSOCIATED WITH THE CARVILLE FACILITY AND REDUCING THE OPERATIONAL FLEXIBILITY REQUIREMENTS?
>
> A.  No. As a QF, the Carville Facility otherwise has the right to "put" non-firm, as-available energy to the Company and be paid the Company's avoided cost for that energy, subject to certain limitations provided for in PURPA and the Federal Energy Regulatory Commission's ("FERC") implementing regulations and incorporated into the LPSC's Avoided Cost General Order. *However, under the Calpine Contract, Calpine will not put unscheduled energy to the Company, but rather will allow the Company to "firm up" the delivery of energy associated with the capacity under contract from Calpine's generating units at the Carville Facility. The Carville Contract provides the System dispatcher certainty about the output from the capacity under contract from the Carville Facility and effectively reduces the operational flexibility requirements for the System.* However, the exact

---

3. Unrecovered Costs From the CGS Program



economic value of this benefit is difficult to estimate. ESI took the conservative approach and chose not to calculate any specific savings associated with this benefit. *It should be noted that the benefits of firming up QF put exist during each year of the contract term.*[18] (emphasis added)

Q    HAS ENTERGY QUANTIFIED THE VALUE OF FLEXIBLE CAPACITY?

A    No.[19]

Q    CAN THE CGS PROGRAM OFFSET SOME OF THE COSTS INCURRED TO PROVIDE FLEXIBLE CAPACITY?

A    Yes. Firming up 150 MW of QF Puts will reduce the costs associated with flexible capacity. Based on a review of various studies presented in recent filings, I believe $2 million per year would be a conservative estimate of the lower operating costs.

Q    PLEASE SUMMARIZE THE BENEFITS OF CGS SUPPLY.

A    CGS can provide the needed base-load supply at a lower capacity cost than ETI's alternatives. Replacing the QF Puts with CGS will reduce the Entergy System's (and ETI's) requirements for flexible capacity, thereby resulting in lower operating costs. In summary, CGS Supply will provide significant economic benefits to all ETI customers. These economic benefits are ignored in ETI's lost revenue analysis.

---

[18] LPSC Docket No. U-28805 Subdocket B: In Re: Application of Entergy Gulf States Louisiana, L.L.C. for Authorization to Participate in a Contract for the Purchase of Capacity and Electric Power from Calpine Energy Services, L.P. and Carville Energy Center, LLC; November 25, 2008, *Application* at 17-18.

[19] ETI's Response to TIEC 1-3.



J. POLLOCK
INCORPORATED

37

Q  SHOULD LOST REVENUES BE INCLUDED AS UNRECOVERED COSTS?

A  No. For all of the reasons cited, including Commission and court precedent rejecting lost revenues as a "cost," the similar impacts between CGS Program, self-generation, and energy efficiency, and ETI's failure to recognize load growth and the potential economic benefits of the CGS Program, the Commission should reject ETI's definition of unrecovered costs. The only legitimate unrecovered costs are those associated with start-up, on-going implementation, and backup power. As these costs will be paid by the CGS Customers, there would be no unrecovered costs associated with the CGS Program.

Q  IF THE COMMISSION DECIDES THAT ETI'S UNRECOVERED COSTS SHOULD INCLUDE LOST REVENUES, HOW SHOULD LOST REVENUES BE QUANTIFIED?

A  I would recommend modifying ETI's lost revenue analysis as follows:

- Lost revenues shown in Exhibit PRM-4 should only be calculated for loads that actually purchased generation services from ETI. This excludes new customers, new loads of existing customers, self-generation displacement, and inactive loads that are brought back on line that would otherwise not have purchased electricity from ETI absent the CGS Program. This would recognize that ETI did not provide generation services under each of these scenarios.

- Lost revenues should be further offset by load growth and any other quantifiable benefits of CGS (*e.g.,* capacity deferral, lower operating costs).

As previously stated, ETI is projecting sufficient load growth to more than offset any lost revenues even before consideration of any other quantifiable benefits. Recognizing these other benefits clearly demonstrates the overall benefits of the CGS Program and that ETI would have zero unrecovered costs.

---

3. Unrecovered Costs From the CGS Program



J. POLLOCK
INCORPORATED

38